COMMONWEALTH *vs.* GEORGE WAYNE MAHNKE.

Suffolk. February 12, 1975. — October 7, 1975.

Present: TAURO, C.J., REARDON, QUIRICO, BRAUCHER, HENNESSEY, KAPLAN, & WILKINS, JJ.

*Homicide. Evidence,* Admissions and confessions, Acceptance or rejection of testimony. *Constitutional Law,* Admissions and confessions, Assistance of counsel, Due process of law, Waiver of constitutional rights. *Practice, Criminal,* Assistance of counsel, Capital case, Findings by judge. *Waiver.*

Failure of persons who were not law enforcement officers to give the warnings set forth in *Miranda* v. *Arizona,* 384 U. S. 436 (1966), to a man abducted by them and questioned about a missing girl did not necessitate allowance of his motion before trial for murder of the girl to suppress inculpatory statements made by him to the abductors while in their custody. [676-677]

Conduct of a police officer who investigated the disappearance of a girl and repeatedly professed a willingness to follow any private leads did not indicate that any "connection" among the girl's father, a "concerned group" of citizens and the officer had "clothed . . . with police authority" actions of the group in abducting and questioning the girl's boyfriend, and their failure to give him the *Miranda* warnings did not require allowance of his motion before trial for murder of the girl to suppress inculpatory statements

made by him to the abductors where it appeared that the officer vehemently opposed any conduct harmful to the defendant or interfering with his liberty, threatened to prosecute anyone who violated the law, had no foreknowledge of the abduction plan, and at the time thereof had never spoken to the abductors. [677-678]

Evidence that a "concerned group" of citizens kept under surveillance and finally abducted the boyfriend of a missing girl and took him to a remote, isolated cabin and there questioned him for over six hours and obtained by coercion statements implicating him in the girl's death, and a proposal to lead the abductors to the unspecified site of her body, that the interrogation then stopped and all hostility and intimidation ceased, that when the abductors left the cabin with him even the vestige of coercion vanished and he was soon "completely free from fear," that he eschewed numerous opportunities to escape and to draw public attention on the trip to the burial site, and that there, holding the only weapon then in evidence, he gave a friendly abductor directions to the site and made incriminating statements with bravado and a lack of fear to another abductor, warranted conclusions by a judge, at a voir dire hearing prior to trial of the boyfriend for murder of the girl, that incriminating statements made by the defendant to his abductors and his actions after leaving the cabin were not products of coercion but were voluntary and admissible [679-686]; KAPLAN, J., dissenting, with whom WILKINS, J., joined [705]; HENNESSEY, J., dissenting, with a statement of the standards of appellate review [723-725].

Evidence that the boyfriend of a missing girl had been abducted by a "concerned group" of citizens and taken to a remote, isolated cabin where by coercion they obtained statements implicating him in the girl's death, which he declared was accidental, that he "had a wish to get things off his chest . . . and was very relieved" after he made the statements, that all coercion then ceased and the abductors left the cabin with the boyfriend, that he subsequently "evidenced no fear of culpability" and disclaimed any fear that the coerced statements would lead to his conviction of murder, and that he had become friendly with one of the abductors warranted conclusions by a judge, at a voir dire hearing prior to trial of the boyfriend for murder, that after leaving the cabin incriminating statements made by the defendant to his abductors were not induced by a belief that because of his coerced statements he had already let the cat-out-of-the-bag, but were voluntary and admissible [686-691]; KAPLAN, J., dissenting, with whom WILKINS, J., joined [705]; HENNESSEY, J., dissenting [722].

An appellate court may not disturb findings of subsidiary facts made by a trial judge and supported by the evidence, or draw inferences contrary to those of the trial judge which were derived from his subsidiary findings and from oral testimony.   [691]

Incriminating statements in a hospital to police by the boyfriend of a girl whose dead body had just been found were properly suppressed at a voir dire hearing prior to trial of the boyfriend for murder for purposes of the prosecution's case in chief by reason of police conduct, particularly with respect to available but uncontacted counsel, clearly inconsistent with the standards established by the *Miranda* case.   [691]

Voluntary and trustworthy but incriminating statements made in a hospital to police by a defendant subsequently indicted for murder, which were properly suppressed at a pre-trial voir dire hearing for purposes of the prosecution's case in chief, were properly ruled by the judge at such hearing to be available to impeach the defendant's testimony if he should take the stand at the trial where it appeared that before questioning the defendant the police gave him the *Miranda* warnings, that he knew that his parents had engaged an attorney to represent him but, instead of halting the inquiry, intermittently asked for his parents and continued to answer questions selectively when they did not arrive, and that he gave an uncertain response when informed that his attorney wished to see him [691-697]; KAPLAN, J., dissenting, with whom WILKINS, J., joined [705]; HENNESSEY, J., dissenting [722].

At a voir dire hearing prior to a trial for murder, a finding by the judge that incriminating statements by the defendant in a hospital to police shortly after the victim's body was found were voluntary was warranted where it appeared that the statements were not the product of previous coerced statements or of a feeling of having let the cat-out-of-the-bag, that before questioning commenced the police informed the defendant of his *Miranda* rights and he had an opportunity to consult with his family, that he was intelligent, educated, and physically and mentally alert, that the police were courteous and the questioning was not unduly protracted, and that the defendant maintained some control over the session and chose the questions to which he would reply; the judge properly ruled that the voluntary statements were available to impeach the defendant's testimony if he should take the stand at the trial [697-700]; KAPLAN, J., dissenting, with whom WILKINS, J., joined [705]; HENNESSEY, J., dissenting [722].

Upon review of a capital case under G. L. c. 278, § 33E, this court decided that justice required the verdict of murder in the second degree be vacated and a verdict of guilty of manslaughter be entered where the thrust of the evidence indicated that the killing

lacked malice aforethought, and occurred after an argument between the victim and her boyfriend, the defendant, when she provoked him with a slap which he answered impulsively and angrily with a single blow of his hand, whereupon she fell and was killed when her head hit a curb, and where it appeared that the defendant was a reasonably normal, mature and intelligent student who had never previously manifested any violent or lawless tendencies. [700-704]

INDICTMENT found and returned in the Superior Court on December 15, 1971.

Pre-trial motions to suppress evidence were heard by *McLaughlin*, C.J., and the case was tried before him.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Gerald Alch* (*Mario Misci* with him) for the defendant.

*Newman A. Flanagan*, Assistant District Attorney, for the Commonwealth.

TAURO, C.J.    The events which frame the central issues in this case arise from legal and illegal efforts of the family and friends of a young woman (the victim) to provide an explanation for her mysterious disappearance in September of 1970.   On December 9, 1971, her body was discovered in a shallow grave near the parking lot of a Sears, Roebuck and Co. (Sears) store in the Fenway area of Boston.   The defendant, a boyfriend of the victim, was indicted for her murder in the first degree. Before trial, the defendant moved to suppress, inter alia,[1] (1) statements he had made on December 9, 1971, to members of a "concerned group" of citizens who had abducted, imprisoned and interrogated him, (2) certain evidence which had come to light through information contained in the aforementioned statements, and (3) a statement given to police from a hospital bed the following day.   After a lengthy voir dire, the trial judge granted the defendant's motions in part and denied them

---

[1] We omit mention of motions to suppress which are not at issue in this appeal.

in part. The defendant was convicted of murder in the second degree and was sentenced to life imprisonment.

In the present appeal, under G. L. c. 278, §§ 33A-33G, the defendant argues four specific assignments of error, chiefly related to the refusal of the judge to exclude from the trial all evidence obtained as a result of his abduction and subsequent police interrogation. We delineate these assignments of error with more particularity below.[2] Other assignments of error, included in the defendant's "Assignment of Errors," have not been briefed or argued in this appeal and must be deemed waived. *Commonwealth* v. *Baker, ante,* 58, 61 (1975), and authorities cited. On January 8, 1975, by our order we directed the trial judge to make supplementary findings with respect to the voluntariness of the statements made by the defendant on December 9 and 10, 1971. These supplementary findings were duly filed on February 12, 1975, and, on the defendant's motion, we allowed submission of further briefs directed to issues raised by the supplementary findings.

At the outset, we briefly summarize the subsidiary facts developed at the voir dire and reported in the careful and detailed initial and supplementary findings of the experienced trial judge.[3] We accept, as we must, the trial judge's resolution of conflicting testimony[4] (*Commonwealth* v. *Valcourt,* 333 Mass. 706, 710 [1956]; *Commonwealth* v. *Femino,* 352 Mass. 508, 513 [1967]; *Commonwealth* v. *D'Ambra,* 357 Mass. 260, 262-263

---

[2] See, however, n. 20, *infra.*

[3] On occasion, we refer to additional facts developed at the voir dire hearing.

[4] The judge chose to reject much of the testimony given by the defendant at voir dire and preferred contradictory testimony given by his captors. The judge was not required to believe the defendant's account. *Commonwealth* v. *Rogers,* 351 Mass. 522, 529 (1967), cert. den. 389 U. S. 991 (1967). *Commonwealth* v. *Femino,* 352 Mass. 508, 512 (1967). See *Commonwealth* v. *Forrester,* 365 Mass. 37, 44 (1974).

[1970]), and will not disturb his subsidiary findings if they are warranted by the evidence (see *Commonwealth* v. *Murphy*, 362 Mass. 542, 547 [1972]). However, ultimate findings and conclusions of law, particularly those of constitutional dimensions, are open for our independent review in this appeal.[5] *Id.* at 551 (Hennessey, J., concurring). See *Commonwealth* v. *Kleciak*, 350 Mass. 679, 685-689 (1966); *Commonwealth* v. *Cook*, 351 Mass. 231, 235 (1966), cert. den. 385 U. S. 981 (1966). Additional facts in the case are discussed below as they become relevant to the several issues of law being considered.

*The Police Investigations.* On September 16, 1970, the day following the victim's disappearance, her parents reported her disappearance to the Boston police, who immediately undertook an investigation. In the course of the early investigation, the defendant was twice interviewed by detectives from division 4 of the Boston police. The police did not suspect that a crime had been committed, but they did suspect that the victim was hiding somewhere in the Boston area and that the defendant had knowledge of where she was hiding, which he refused to divulge. Their suspicions were aroused by the several inconsistent stories which the defendant told in the September 16 interrogation regarding the events of the previous evening.[6] The second interview, held September 24 with the defendant's attorney present, had as its primary purpose a discussion of whether, and in

---

[5] The scope of review by the United States Supreme Court is at least this broad. See, e.g., *Haynes* v. *Washington*, 373 U. S. 503, 515-516 (1963); *Davis* v. *North Carolina*, 384 U. S. 737, 741-742 (1966).

[6] Initially, the defendant claimed that he and the victim had not met the night before as planned. Under further questioning, he admitted that he had seen her but said that he had left her at a ramp of the toll road to New York where, he said, she was going to have an abortion. When pressed further, he altered details of this story as well.

what circumstances, the defendant might take a lie
detector test. In fact, the defendant never took the test.

The police investigation continued, but failed to
discover the cause of the victim's disappearance or her
location. In early December, 1970, Detective Stanley
Gawlinski (Gawlinski), attached to the office of the
district attorney for Suffolk County, was assigned to the
case on a full time basis. After repeated urging by the
victim's father (the father) Gawlinski arranged a meeting
with the defendant for December 22 in the law office of
the defendant's attorney. The defendant, in the presence
of his attorney, described his relationship with the victim
and repeated the last story he had related to the police on
September 16. In April, 1971, again at the father's
suggestion, Gawlinski arranged to have Muddy River in
the Fenway area dragged for the victim's body. When
this search proved unavailing, Gawlinski conceded that
he had exhausted his leads and consigned the case to the
inactive file at the district attorney's office. Thereafter,
Gawlinski maintained only sporadic contact with the
victim's family and limited his investigations to leads
which were supplied by interested persons. Even this
limited contact ceased in August, 1971, after an un-
pleasant conversation in which he reprimanded the father
for an attempt[7] by some young men to question the
defendant at his place of work.

*Private Efforts.* Throughout the course of the police
investigation, the father and his son were impatient with
police investigations and unwilling to place sole reliance
on them. The father worked with three private investi-
gators and utilized the voluntary assistance of a large
number (perhaps as many as 100) of family or
neighborhood friends. Of these friends, a core group of
the son's friends, styled the "concerned group" by the
judge, were the most persistent workers. Included in the
concerned group were Gary Fisher, James Ferreri, Frank

---

[7] This is described in somewhat greater detail at p. 678, *infra.*

Fontacchio, John (Jay) Campbell and Joseph (Jay) Heard, participants in the abduction of the defendant.

The private efforts were principally[8] directed toward a program of surveillance designed to determine the pattern of the defendant's movements. Ultimately, the surveillance program was used to provide an opportunity to put questions to the defendant under conditions that would compel responses. There were a number of attempts to question the defendant. In September, 1970, before reporting the disappearance to the police, the father and son sought out the defendant on the campus of Northeastern University, where he was a student, questioned him, and took him on a tour of the Fenway district, in which, it could be supposed, the defendant met or was to have met the victim on the night of September 15. On two subsequent occasions, members of the concerned group accosted the defendant at Northeastern University and attempted, unsuccessfully, to detain him. In December, 1970, two members of the concerned group, Fontacchio and Campbell, appeared in the reception area of the office of the defendant's attorney while the meeting between the defendant and Gawlinski was in progress and inquired whether the defendant was within. They later followed the defendant and his mother. In August, 1971, Ferreri and Fontacchio were thwarted in an attempt to confront the defendant in the office of Henry F. Bryant & Son, Inc., where he was a summer employee.[9]

*The Abduction.* On December 8, 1971, the defendant drove to Mt. Ida Junior College in order to meet a young woman with whom he had a date. He arrived about

[8] On one occasion, the larger group was assembled in the parking lot of the Sears store in the Fenway district to scour the area for clues or the victim's body.

[9] This incident precipitated the cessation of communication between Gawlinski and the father which lasted until the discovery of the body in December.

7:30 P.M. A surveillance group, consisting of the father, Fisher, Ferreri and Fontacchio, followed him in two cars. After the defendant had parked his car and entered a building, Ferreri and Fontacchio concealed themselves in heavy foliage near the defendant's car. When the defendant returned to his car, Ferreri emerged from the bushes, grabbed the defendant, and demanded to question him. As the defendant struggled to free himself, Ferreri, described as a "big, strong, husky youth," struck him near the left eye. The defendant fell and lost his glasses. Fontacchio approached and he and Ferreri guided the defendant into the back seat of an Oldsmobile. The father, who had moved from the Oldsmobile to the second car, raced the engine to divert attention from the defendant's calls for help. While Fisher drove the Oldsmobile, Ferreri maintained a headlock on the defendant so that his head was below the level of the front seat. With the defendant under secure restraint, Fisher drove to his uncle's hunting cabin in Worthington, Massachusetts, in the western part of the State, 128 miles from Mt. Ida Junior College. Though the surveillance for the night of December 8 had undoubtedly been prearranged, the judge was persuaded and found that the idea to remove the defendant to a remote, isolated hunting cabin was "spontaneous and unpremeditated."[10]

On reaching the cabin, Fisher gained entrance by breaking a pane of glass. The defendant was placed on a couch in the room farthest from the front door, and ice packs and snow were applied to the severe bruises on his face which had resulted from Ferreri's blow. At approximately 11:30 P.M. Ferreri and Fontacchio departed

---

[10] In this respect, the judge found convincing the evidence that neither Ferreri nor Fontacchio knew where he was going when Fisher drove to the cabin, that the cabin was locked, that the group had to force an entry, and that the entire area was "knee-deep in snow." The judge concluded that Fisher was "the father of the thought" to take the defendant to Worthington.

for Boston. Fisher, armed with a bread knife[11] which he exhibited to the defendant, remained in the room with the defendant. The judge found that they dozed intermittently.[12]

Interrogation of the defendant commenced on the return of Ferreri with Jay Campbell about 6 A.M. Questioning by the group[13] continued for over six hours. During that time, the defendant admitted nothing. The questioning was repetitious and insistent. The interrogators used extremely rough language and occasionally threatened the defendant's life. The judge was satisfied, however, that no physical force was applied. Finally, at approximately 12:30 P.M. the defendant said that he wanted to speak to Ferreri alone. Ferreri wanted Campbell present at any further conversation and the defendant finally agreed.

Alone in the room with these two, the defendant, after receiving assurances that he would not be harmed, related facts pertaining to the victim's death: He met her on the night of September 15 at a bus stop near the Sears store. When she told him that she was pregnant and that he was the father, he denied the responsibility and accused her of having relations with a man in California. She slapped him and he struck her in retaliation. She fell, hit her head on the curb, and lay motionless. After mouth-to-mouth resuscitation failed to revive her, the defendant realized she was dead. He carried her down a

---

[11] This was the first weapon used by any member of the group. There was some uncorroborated testimony that either Ferreri or Fontacchio had had a gun, but the judge disbelieved it.

[12] The trial judge found, and his conclusion appears amply justified, that escape at that time would have been impossible. The defendant had poor vision without his glasses. Even if he had succeeded in escaping from the cabin without drawing Fisher's attention, he would have faced the intractable problem of securing assistance in an isolated, snowbound area on a cold night.

[13] Fontacchio and Jay Heard arrived with breakfast at 10 A.M.

hill to some abandoned railroad tracks, wrapped her in a blanket he found there, dug a shallow grave with his shoes, and buried her. The defendant declined to specify the exact location of the body and would say only that the gravesite was in the area near the Sears store. However, he was willing to lead the group to the body.[14]

The interrogation ceased once the defendant had made these statements. The judge found that a spirit of relative friendliness supplanted the former hostile, strained relationship between the defendant and his captors. The defendant expressed relief at having finally disclosed his secret and referred to Ferreri and Campbell as friends. When the rest of the group returned, Ferreri persuaded the others to trust the defendant to lead them to the body. They tidied up the cabin and departed for Boston about 4:15 P.M.[15]

As the group emerged from the cabin with the defendant it encountered two hunters, David Tyler, the chief of police of Worthington, and Reino Liimatainen. Earlier in the day, Tyler had stopped at the cabin and, without identifying himself, had questioned Fisher about his occupation of the cabin. Though Fisher had partially satisfied Tyler as to his right to be there, Tyler had remained somewhat suspicious. At 4:15 P.M. Tyler questioned Fisher once again. Liimatainen, who harbored his own suspicions, slipped shells into the chambers of his shotgun and, in a loud voice, said, "If there is any funny business I will blow your guts out." The judge

---

[14] In his testimony at voir dire, the defendant denied having made the incriminating statements. He admitted that, as a means of getting back to Boston, he had said that he would take the young men to the body. He testified that in fact he had known nothing about the body and implied that the young men knew its location and were seeking to fasten guilt on him. He sought to explain some of his conduct by testimony that the concerned group had said they were holding his brother hostage.

[15] The time interval from roughly 2 P.M. to 4:15 P.M. is not well accounted for in the voir dire record.

found that the entire party, including the defendant, could hear this and that the group was under the hunters' "control" at this point.   Fisher evidently allayed Tyler's suspicions once again, for the episode ended with the group's driving away in two cars.   As they left, the defendant remarked to Ferreri, "See, I could have gotten away if I wanted to, but I didn't."[16]

The defendant directed Ferreri to drive to the Sears parking lot.   They arrived in darkness at approximately 6:30 P.M.

The defendant described the gravesite to Ferreri as an overgrown area near an abandoned railroad spur below a grouping of three windows in a Metropolitan District Commission maintenance shed.   Ferreri, alone, walked down a hill to the tracks.   Unable to find the gravesite, he returned to the parking lot, where the others had remained, and told the defendant, "You will have to come down with me."   The defendant refused and stated that the place was "spooked" and that they would kill him if he went down there.   Heard handed the defendant a pocketknife for protection.   Whereupon, Ferreri started down and was followed by the defendant, who held the open knife.   The defendant refused to proceed the full distance to the grave, but he did point out its location.   The defendant then returned to the parking lot.   Ferreri, joined by Fontacchio and Campbell, ascertained that a body was buried at the place indicated. Ferreri then drove the defendant to a point a short distance from his home.

While Ferreri had been searching the track area the first time, the defendant found himself momentarily alone with Heard and casually acknowledged that he had killed the victim.   In response to a question from Heard, he said that he was not worried about the consequences because the abductors would be hostile witnesses whose

---

[16] The judge's finding in this respect is principally based on Ferreri's testimony.

testimony would not stand up in court, and because his grandmother would hire a certain well-known lawyer who would get him off. Asked how he had expected to get away with it at the time, the defendant replied that he had thought the rainfall on September 15 would prevent police dogs from discovering the body.

*Subsequent Events: Police Reinvolvement.* Sometime that evening, the group notified the victim's family that her body had been found. About 11:30 P.M. the father telephoned Gawlinski, who had just returned home from attending classes and studying at Northeastern University, described the location of the body, and gave a somewhat cryptic, incomplete account of the events leading up to the discovery. After Gawlinski finished his telephone conversation with the father, his wife informed him that the defendant's attorney had tried several times to reach him that night. Gawlinski did not return the attorney's calls. He informed his partner in the case and a private investigator the father had hired that the body had been discovered and, after some delay, drove to the gravesite.

About 3 A.M. Gawlinski and other officers went to the defendant's home.[17] From there, they proceeded to the Massachusetts General Hospital, where the defendant had been admitted as a patient. At the hospital, after securing permission to speak to the defendant, two officers went to his room[18] with a police stenographer while Gawlinski remained downstairs.

The defendant was interrogated from 3:30 A.M. until 7:30 A.M. Before questioning him, the police gave the defendant the *Miranda* warnings. The defendant did not request counsel or respond to the precise question whether he understood the warnings. On at least four

[17] The defendant's mother told Gawlinski in the presence of other officers that the defendant's attorney wished to speak to Gawlinski.

[18] During the course of questioning, the defendant was moved from a room he shared with three other patients to a corridor, and thence to a private room.

occasions, he did ask to have his parents present. Never-
theless, the police continued their questioning. The
defendant did not respond to some questions; others were
answered in a halting manner. The judge found that the
defendant showed intelligent discrimination and some
control over the course of the interrogation.[19] Ultimate-
ly, the defendant allegedly made a statement which, in
substance, reiterated the story he had related to the
concerned group in the cabin.

About 7:30 A.M. on December 10, the interrogating
officers left the hospital and met Gawlinski at the
entrance. At 8:30 A.M. one of them, Sergeant Daley,
wrote down his recollection of the defendant's statement.
The following morning, December 11, the defendant was
discharged from the hospital. He was indicted on
December 15, 1971.

*Principal Motions and Assignments of Error.*[20] After
the voir dire hearing on motions to suppress, the judge
ruled that all statements which the defendant had made
to his kidnappers prior to the departure of the party from
the cabin at 4:15 P.M. were to be suppressed and inad-
missible at trial because they were the product of coer-
cion. In this respect, the judge attached no significance
to the fact that the defendant was coerced by private
persons and not by police. However, he ruled that later
statements to the kidnappers and "statements and actions
leading to the discovery of the body of the deceased
near . . . [the Sears store in] the early evening of Decem-
ber 9, 1971" would be admissible. These statements and
actions he found to be voluntary and the result of the

---

[19] For example, the defendant objected to the stenographer's pres-
ence and he was dismissed.

[20] We omit mention of the numerous assignments of error which
have not been argued and are deemed waived. See p. 666, *supra*.
We also omit mention of one assignment of error which, though it
was argued before this court, considered by us and found to be with-
out merit, has not received extended discussion herein below.

exercise of the defendant's "free will."[21]    The defendant assigns this ruling as error.

The defendant also moved to suppress the statement allegedly made by him to the police at the Massachusetts General Hospital on the morning of December 10, 1971. The judge ruled that, as the police had knowingly denied the defendant the benefit of advice of his counsel, the statement was not admissible in the Commonwealth's case in chief.   Nevertheless, he ruled on the authority of *Harris* v. *New York*, 401 U. S. 222 (1971), that the Commonwealth could introduce the statement by way of impeachment if the defendant testified.   The defendant, who testified at voir dire but not at trial, assigns the latter ruling as error.

## I. MIRANDA WARNINGS BY THE CONCERNED GROUP.

We disagree with the defendant's contention that the failure of his kidnappers to apprise him of his *Miranda* rights requires suppression of all statements made on December 9.   In *Miranda* v. *Arizona,* 384 U. S. 436, 444, 461 (1966), the Supreme Court formulated a series of prophylactic rules (see *Michigan* v. *Tucker,* 417 U. S. 433, 443 [1974]), designed "to secure the privilege against self-incrimination" from overreaching and coercion during custodial interrogation.   Custodial interrogation was defined as "questioning initiated by *law enforcement officers* after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way" (emphasis supplied).    *Miranda* v. *Arizona, supra,* at 444.    *Commonwealth* v. *White,* 353 Mass. 409, 415-416 (1967), cert. den. 391 U. S. 968

---

[21] He also ruled that these statements "amounted only to *admissions*" (emphasis in original) and, as such, were not entitled to the full safeguards accorded confessions under Massachusetts law.   See n. 24, *infra.*

(1968). In the instant case, the kidnappers were not law enforcement officers. They were private citizens embarked on an illegal enterprise. The *Miranda* rules do not extend to their activities. See *United States* v. *Antonelli,* 434 F. 2d 335, 337 (2d Cir. 1970), and authorities cited; *United States* v. *Bolden,* 461 F. 2d 998 (8th Cir. 1972); *United States* v. *Casteel,* 476 F. 2d 152 (10th Cir. 1973).

Nevertheless, the defendant argues that the "connection" among the kidnappers, the father, and Gawlinski "clothed the actions of the kidnappers with police authority." Again, we disagree. Of course, the police may not accomplish through private proxies what they cannot do directly. If the defendant had shown that the group of kidnappers was "functioning as an instrument of the police" (*United States* v. *Brown,* 466 F. 2d 493, 495 [10th Cir. 1972]; cf. *Coolidge* v. *New Hampshire,* 403 U. S. 443, 487 [1971]), or acting as an agent of the police pursuant to a scheme to elicit statements from the defendant by coercion or guile (cf., e.g., *Commonwealth* v. *White, supra,* at 416; *Commonwealth* v. *Martin,* 357 Mass. 190, 193 [1970]), the statements would have to be suppressed for failure to give *Miranda* warnings. However, we agree with the judge that the subsidiary facts developed at voir dire supported the conclusion that the defendant did not establish such a police connection. It is true that Gawlinski worked closely with the victim's father in the initial stages of his investigation. (This was to be expected.) It is also true that he was aware of the surveillance undertaken by the concerned group and aware of the father's deepening bitterness and frustration and that, despite his awareness, he did not order the father and his associates to refrain from further investigation and repeatedly professed himself willing to follow any leads which private efforts uncovered. Yet, when considered in all the circumstances, these facts are insufficient to establish police connivance in, and responsibility for, the events of December 8 and 9. Gawlinski vehe-

Commonwealth v. Mahnke.

mently opposed any conduct which would harm the
defendant or interfere with his liberty. He cautioned the
father against any "rough stuff" and threatened to prose-
cute anyone who violated the law. In August, 1971,
after the incident at Henry F. Bryant & Son, Inc.,
Gawlinski reprimanded the father. The two had harsh
words, and communication between them, which had
been sporadic since April, lapsed completely until Decem-
ber 9.[22] Moreover, Gawlinski was not shown to have
had foreknowledge of the kidnapping plan and first
learned of its occurrence at 11:30 P.M. on December 9.
In these circumstances, despite whatever encouragement
the kidnappers may have felt they had received from
Gawlinski's talk about possible leads, we cannot say that
they acted as agents or instruments of the police in
extracting statements from the defendant and that the
absence of *Miranda* warnings required suppression of
those statements.[23]

---

[22] The judge attributed this lapse to Gawlinski's disgust over the
incident.

[23] The defendant's reliance on *Gambino* v. *United States*, 275 U. S.
310 (1927), and *Knoll Associates, Inc.* v. *Federal Trade Commn.* 397
F. 2d 530 (7th Cir. 1968), is misplaced. In *Gambino*, New York
State troopers had cooperated extensively with the Federal government
over a period of months to control liquor traffic at a United States
border. The search and seizure challenged in the case had been
undertaken "solely for the purpose of aiding the United States in the
enforcement of its laws." *Gambino* v. *United States, supra,* at 317.
In *Knoll Associates* the court set aside an order of the Federal Trade
Commission because it was based on evidence obtained through a
"theft of corporate documents on behalf of the government for use in
a then pending proceeding against the corporate owner of what was
stolen." *Knoll Associates, Inc.* v. *Federal Trade Commission, supra,*
at 535. In the instant case, cooperation between the concerned group
and Gawlinski had been sporadic at best. At the time of the abduc-
tion, he had never spoken to members of the group who abducted the
defendant and had not spoken to the father for over three months. It
could not be said that the abduction had as its sole purpose aid to the
enforcement of the law. There was no proceeding pending at the
time against the defendant. Indeed, no crime was then officially
under investigation.

Moreover, each of the cases relied on by the defendant is a Fourth

## II. VOLUNTARINESS OF POST-4:15 STATEMENTS
## TO THE ABDUCTORS.

1. Since the *Miranda* rules are not apposite to the statements [24] made by the defendant to his abductors, the admissibility of these statements at trial is governed by the due process standard of voluntariness. *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 533 (1975). *Davis* v. *North Carolina*, 384 U. S. 737, 740 (1966). *Procunier* v. *Atchley*, 400 U. S. 446, 453 (1971). A conviction founded in whole or in part on statements which are the product of physical or psychological coercion deprives the defendant of his right to due process of law under the Fourteenth Amendment and, as a consequence, is invalid. *Rogers* v. *Richmond*, 365 U. S. 534, 540-541 (1961). *Jackson* v. *Denno*, 378 U. S. 368, 376 (1964). See *Commonwealth* v. *Harris*, 364 Mass. 236, 241 (1973). Such convictions are invalid irrespective of the truth or

---

Amendment case, implicating the full range of protection for a right of constitutional dimension. As noted above, the *Miranda* rules are only prophylactic rules which *themselves* safeguard rights of constitutional magnitude. These Fourth Amendment cases do not support extension of *Miranda* in this case.

[24] The judge found that the statements made after 4:15 P.M. "amounted only to *admissions* and not *confessions* because they did not amount to an 'acknowledgment of guilt of the entire crime charged'" (emphasis · in the original). See *Commonwealth* v. *Haywood*, 247 Mass. 16, 18 (1923). Under settled Massachusetts law, a defendant is entitled to lesser safeguards with respect to the admissibility of admissions and exculpatory statements than he would have if the statements had amounted to a confession. *Commonwealth* v. *Chapman*, 345 Mass. 251, 254 (1962). See *Commonwealth* v. *Dascalakis*, 243 Mass. 519, 521 (1923); *Commonwealth* v. *Haywood*, *supra*, at 17-18; *Commonwealth* v. *Gleason*, 262 Mass. 185, 190 (1928). Though this distinction has been criticised (*Commonwealth* v. *Wallace*, 346 Mass. 9, 17 [1963]), we do not consider its continuing validity in the instant case because we deem correct the admission at trial of evidence concerning the defendant's post-4:15 statements and actions even under the more stringent standards applicable to confessions. Thoughout this opinion, we refer to the defendant's *admissions* as "statements."

falsity of the statements admitted. "The use of coerced confessions . . . is forbidden because the method used to extract them offends constitutional principles" (*Lego* v. *Twomey*, 404 U. S. 477, 485 [1972]) and because "declarations procured by torture [or other coercive means] are not premises from which a civilized forum will infer guilt." *Lyons* v. *Oklahoma*, 332 U. S. 596, 605 (1944). See *Rogers* v. *Richmond, supra*, at 540-541; *Jackson* v. *Denno, supra*, at 385-386. Cf. *Stein* v. *New York*, 346 U. S. 156, 192 (1953).

There is no easy acid test for voluntariness. Judicial determinations must rest on more than a "mere color-matching" comparison of analogous cases. *Reck* v. *Pate*, 367 U. S. 433, 442 (1961). In each case, the court must assess the totality of relevant circumstances to ensure that the defendant's confession was a free and voluntary act and was not the product of inquisitorial activity which had overborne his will. *Clewis* v. *Texas*, 386 U. S. 707, 708 (1967). *Procunier* v. *Atchley*, 400 U. S. 446, 453 (1971), and cases cited. *Delle Chiaie* v. *Commonwealth*, 367 Mass. 527, 533 (1975). See *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 225-226 (1973). The burden of proof is on the government to show such voluntariness by a preponderance of the evidence. *Jackson* v. *Denno*, 378 U. S. 368, 376-377 (1964). *Lego* v. *Twomey*, 404 U. S. 477, 489 (1972).[25]

2. These principles apply even though the statements were extracted by private coercion, unalloyed with any official government involvement. We have not squarely decided this point previously, but it is implicit in our decisions in *Commonwealth* v. *White*, 353 Mass. 409, 417-418 (1967), cert. den. 391 U. S. 968 (1968) (voluntariness test applied to confession made to private parties

---

[25] This proposition is now established as a constitutional right. The different view expressed in *Commonwealth* v. *Johnson*, 352 Mass. 311, 315-316 (1967), cert. dism. 390 U. S. 511 (1968), must be taken to be superseded. We need not inquire how far the *Johnson* case was qualified by *Commonwealth* v. *Cain*, 361 Mass. 224, 228 (1972).

after two statements to police which were inadmissible under *Miranda*), *Commonwealth* v. *Wallace*, 356 Mass. 92, 96-97 (1969) (statements to Canadian police), and *Commonwealth* v. *Martin*, 357 Mass. 190, 193 (1970). The Supreme Court of the United States has not spoken to the question[26] but it has invoked the usual analysis where pressure was exerted by private persons while the defendant was nominally in official custody. See *Thomas* v. *Arizona*, 356 U. S. 390 (1958) (private citizen, a member of a posse, abused a prisoner who later confessed to the authorities). A number of State courts have applied the due process analysis to circumstances in which the only claimed coercion leading to a confession was private. See, e.g., *Palmore* v. *State*, 244 Ala. 227 (1943); *State* v. *Christopher*, 10 Ariz. App. 169 (1969); *People* v. *Haydel*, 12 Cal. 3d 190 (1974); *Lawton* v. *State*, 152 Fla. 821 (1943).

Underlying the above-cited decisions in this jurisdiction and other jurisdictions is the fundamental recognition that a statement obtained through coercion and introduced at trial is every bit as offensive to civilized standards of adjudication when the coercion flows from private hands as when official depredations elicit a confession. Statements extracted by a howling lynch mob or a lawless private pack of vigilantes from a terrorized, pliable suspect are repugnant to due process mandates of fundamental fairness and protection against compulsory self-incrimination. See *People* v. *Berve*, 51 Cal. 2d 286, 290 (1958).

3. When, as in the instant case, several statements given at different times by the defendant must be evaluated for voluntariness, a finding that an earlier statement was involuntary does not necessarily require suppression of the later statements. "The admissibility of the later

---

[26] Arguably, the Supreme Court's position is implicit in *Bram* v. *United States*, 168 U. S. 532 (1897), which strongly resembles *Commonwealth* v. *Wallace, supra*.

confession depends upon the same test — is it voluntary. Of course the fact that the earlier statement was obtained from the prisoner by coercion is to be considered in appraising the character of the later confession. The effect of earlier abuse may be so clear as to forbid any other inference than that it dominated the mind of the accused to such an extent that the later confession is involuntary. . . ." *Commonwealth* v. *White,* 353 Mass. 409, 417 (1967), cert. den. 391 U. S. 968 (1968), quoting from *Lyons* v. *Oklahoma,* 322 U. S. 596, 603 (1944). It is equally true, however, that the defendant may have been under no compulsion at the time of the later statements and may have felt no effect of the earlier abuse at the time. The later statements, then, would be admissible. The United States Supreme Court has never held that "making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed." *United States* v. *Bayer,* 331 U. S. 532, 541 (1947).

Two lines of analysis emerge from the case law and guide our analysis of the voluntariness of the defendant's post-4:15 statements. We are still required to look to the "totality of the circumstances." *Clewis* v. *Texas,* 386 U. S. 707, 710 (1967). *Darwin* v. *Connecticut,* 391 U. S. 346, 349 (1968). See *United States* v. *Bayer, supra,* at 540-541. However, these lines of analysis furnish convenient, commonsense approaches to ordering and evaluating the necessary elements of the circumstances which bear on the voluntariness of the later statements. In the first line of analysis, the court must look for a "break in the stream of events," the coercive circumstances which extracted earlier statements, "sufficient to insulate the [subsequent] statement from the effect of all that went before." *Clewis* v. *Texas, supra,* at 710. The focus of this line of analysis is on external constraints, continuing or new, which may have overborne the defendant's will. When circumstances no

longer coerce the defendant, a break in the stream has occurred. The second line of analysis looks more specifically to the effect of the previous confession on the defendant's will. To be admissible, subsequent statements may not be "merely the product of the erroneous impression that the cat was already out of the bag" (*Darwin* v. *Connecticut*, 391 U. S. 346, 351 [1968] [Harlan, J., concurring and dissenting]) because one coerced confession has let the secret "out for good." *United States* v. *Bayer*, 331 U. S. 532, 540 (1947).

Pursuant to our order of January 8, 1975, the judge has filed supplementary findings addressing the issue of voluntariness as elucidated by these lines of analysis. After a detailed recitation of the evidence and the facts found by him, he concluded that the post-4:15 P.M. statements made by the defendant to his abductors were voluntary and admissible. We believe such a conclusion was warranted.

a. *Break in the stream of events.* The judge quite correctly ruled that statements obtained by the concerned group from the defendant prior to the departure from the cabin were involuntary because "induced by threats, duress, intimidation, fear, and at least some violence (the original striking of the defendant at Mt. Ida)." The defendant, held incommunicado (see, e.g., *Rogers* v. *Richmond*, 365 U. S. 534, 536 [1961]) by his violent, lawbreaking captors (see, e.g., *Brown* v. *Mississippi*, 297 U. S. 278 [1936]) in a remote hunting cabin, was subjected to continuous rough questioning and threats (see, e.g., *Lynumn* v. *Illinois*, 372 U. S. 528 [1963]) designed to overcome his resistance and extract by psychological compulsion what he would not give freely. These circumstances are "so inherently coercive that . . . [their] very existence is irreconcilable with the possession of mental freedom [by the person] . . . against whom . . . [the] full coercive force is brought to bear." *Ashcraft* v. *Tennessee*, 322 U. S. 143, 154 (1944). *Reck* v. *Pate*, 367 U. S. 433, 442 (1961).

However, as the trial judge found on sufficient evidence, once the defendant had admitted his connection with the death, all hostility and intimidation ceased. The defendant's captors no longer threatened him or sought to elicit further information through their rough persistent questioning. A peculiar relationship of friendship and mutual trust seems to have arisen between Ferreri and the defendant. Thus, though the defendant remained captive while the concerned group discussed their next move, the atmosphere of coercion had been dispelled to a large extent.

After the group had left the cabin, even the vestige of coercion inherent in the group's control over the defendant's person vanished. Numerous opportunities for escape were presented to the defendant. The defendant eschewed these opportunities, though, as the trial judge found on ample evidence,[27] he "knew he could have effected an escape." The defendant could have made some protest or sign when the group was within range of the hunters' guns. The warning about "funny business," issued by Liimatainen, was an invitation to outcry by the defendant. Yet he chose not to seek assistance. Similarly, on the trip back to Boston, the defendant made no attempt to attract attention at the Massachusetts Turnpike toll booths through which the group passed. While Fontacchio and Campbell, the other members of the concerned group in the car, dozed, the defendant conversed in a friendly manner with Ferreri, the driver. At the Weston toll, the defendant contributed part of the necessary payment because Ferreri lacked sufficient funds. When the group reached the Sears parking lot, the defendant again let pass

---

[27] One example is Ferreri's testimony concerning the defendant's statements to him after the incident with the hunters. As recounted by Ferreri, these statements reflect the defendant's awareness of, and express rejection of, the opportunity for escape presented by the appearance of the hunters.

opportunities for escape. He did not attempt to escape to the nearby MBTA station or to mingle with shoppers traversing the parking lot. He could have but did not create a disturbance which would have drawn public attention to his plight.

Rather, he acted like a man who felt sufficiently in control of his circumstances to make a free choice. Initially, he refused to go down to the burial site, but he agreed when armed with the only weapon then in evidence. Even then, he exercised his will and halted short of the precise site. He gave Ferreri directions to the body and, while Ferreri searched, engaged in casual incriminating conversation with Heard. His statements to Heard exhibited a bravado and lack of fear which were indicative of mental freedom of action.

Given the opportunities for escape, the lack of physical restraint, and the defendant's possession of the weapon, we believe that the judge had ample justification for his findings that the defendant's statements and actions were not products of coercion exerted after he left the cabin. These factors separate the later statements from the coercive circumstances surrounding the earlier ones. Cf. *Clewis v. Texas*, 386 U. S. 707, 710 (1967). This is not a case such as *Leyra v. Denno*, 347 U. S. 556 (1954), or *Beecher v. Alabama*, 389 U. S. 35 (1967), in which the later statements were extracted by part of a continuous coercive process. This is not a case such as *Reck v. Pate*, 367 U. S. 433 (1961), *Clewis v. Texas*, 386 U. S. 707 (1967), or *Darwin v. Connecticut*, 391 U. S. 346 (1968), in which the defendant remained in official custody without access to potentially friendly faces[28] or intercession for the duration of the "stream of events." The objective evidence of the defendant's behavior after leaving the cabin substantiates the judge's finding that the mere continuation in the presence of the concerned group

---

[28] See *Goldsmith v. United States*, 277 F. 2d 335 (D. C. Cir. 1960), cert. den. sub nom. *Carter v. United States*, 364 U. S. 863 (1960).

did not coerce the defendant or render his post-4:15 P.M. statements involuntary.

b. *Cat out of the bag.* The cat-out-of-the-bag line of analysis requires the exclusion of a statement if, in giving the statement, the defendant was motivated by the belief that, after a prior coerced statement, his effort to withhold further information would be futile and he had nothing to lose by repetition or amplification of the earlier statements. Such a statement would be inadmissible as the direct product of the earlier coerced statement. The primary exposition of the underlying proposition by the United States Supreme Court occurs in *United States* v. *Bayer,* 331 U. S. 532, 540-541 (1947). Mr. Justice Jackson wrote: "Of course, after an accused has once let the cat out of the bag by confessing, no matter what the inducement, he is never thereafter free of the psychological and practical disadvantages of having confessed. He can never get the cat back in the bag. The secret is out for good. In such a sense, a later confession always may be looked upon as fruit of the first." However, Mr. Justice Jackson qualified his statement of the principle: "But this Court has never gone so far as to hold that making a confession under circumstances which preclude its use, perpetually disables the confessor from making a usable one after those conditions have been removed."

Mr. Justice Harlan returned to the point in his opinion (concurring in part and dissenting in part) in *Darwin* v. *Connecticut,* 391 U. S. 346, 350-351 (1968). He wrote: "A principal reason why a suspect might make a second or third confession is simply that, having already confessed once or twice, he might think he has little to lose by repetition. If a first confession is not shown to be voluntary, I do not think a later confession that is merely a direct product of the earlier one should be held to be voluntary. It would be neither conducive to good police work, nor fair to a suspect, to allow the erroneous impression that he has nothing to lose to play the major

role in a defendant's decision to speak a second or third time. . . . I would remand for further proceedings, in order to give the prosecution the opportunity to show that the third confession was not merely the product of the erroneous impression that the cat was already out of the bag." *Id.* at 350-351.[29]

The evidence supports the supplementary finding of the judge that there was "no 'cat out of the bag' aspect to . . . [the defendant's post-4:15 P.M.] statements and actions." The judge was warranted in finding that the defendant did not yield further information out of a conviction that his first coerced statement had damned him and in finding that subsequent admissions were not attributable to a feeling that nothing further would be lost by repetition. As the judge found, the defendant "evidenced no fear of culpability" after the statements in the cabin and did not believe what he said in the cabin would have serious adverse effects.[30] In his conversation with Heard, the defendant disclaimed any fear that the statements made under coercion would lead to his conviction. He stated that a (specific) good lawyer would discredit his abductors' testimony and secure his acquittal in any subsequent proceeding. He may have thought he had "little to lose" (*Darwin* v. *Connecticut*, 391 U. S. 346, 350 [1968] [Harlan, J.]) through further admissions, but not because he feared the use of his previous statements. He may have thought he had "little to lose" based on an actual belief that he could not be convicted. Perhaps he thought that the kidnappers believed and accepted his story that the victim's death was accidental.

---

[29] See, further, *Harrison* v. *United States*, 392 U. S. 219, 226-228 (1968) (opinion of the court and dissenting opinion of Harlan, J.); *United States* v. *Gorman*, 355 F. 2d 151, 157 (2d Cir. 1965), cert. den. 384 U. S. 1024 (1966). Cf. *Commonwealth* v. *Spofford*, 343 Mass. 703 (1962).

[30] Actually his statements were somewhat exculpatory and indicated that the death was accidental.

The post-4:15 statements and actions appear to be attributable to the peculiar friendship which the defendant formed with Ferreri or to relief at having divulged his secret at last.[31]    Neither of these sentiments is the sentiment against which the cat-out-of-the-bag analysis would guard.   Fear, continuation of coercive effects, and a sense of futility of attempting to "get the cat back in the bag" are the objects of the analysis.   See *Darwin* v. *Connecticut, supra,* at 350; *Harrison* v. *United States,* 392 U. S. 219, 224-226 (1968).

In these circumstances, we cannot say, contrary to the judge's findings, that the post-4:15 statements and actions were involuntary because they were products of earlier statements.   Cf. *United States* v. *Gorman,* 335 F. 2d 151, 157 (2d Cir. 1965), cert. den. 384 U. S. 1024 (1966).[32]

4. In holding the post-4:15 statements made to the abductors admissible, we do not in any way approve the illegal and reprehensible manner in which they were

---

[31] The judge found that the defendant "had a wish to get things off his chest . . . and was very relieved after he gave his first statement in the cabin in Worthington."

[32] We do not deal separately here with the question whether the defendant's post-4:15 statements and actions, including those leading to the discovery of the body, were the "fruits" of the earlier involuntary statements.   See *Silverthorne Lumber Co.* v. *United States,* 251 U. S. 385 (1920); *Nardone* v. *United States,* 308 U. S. 338 (1939); *Wong Sun* v. *United States,* 371 U. S. 471 (1963).   In the context of the instant case, the factual inquiry required to decide whether the causal connection between the earlier statements and the later ones had "become so attenuated as to dissipate the taint" of the earlier coercion (*Nardone* v. *United States, supra,* at 341; *Wong Sun* v. *United States, supra,* at 491) tracks the cat-out-of-the bag analysis. In each line of analysis, the court must examine the circumstances to determine if the later statements were the product of the lingering psychological effects of the prior coerced confession.   Having concluded pursuant to the cat-out-of-the-bag analysis that the defendant's subsequent statements and actions resulted from an independent, voluntary decision to cooperate with his abductors, we also conclude that the statements and actions were not the "fruits" of the prior involuntary statements.

obtained. Justice Kaplan's dissent begins with a statement which focuses attention on the "dangerous vigilantism" evident in this case and which indicates that such vigilantism must not be condoned. We join with him in vigorous condemnation of the violence, kidnapping and intimidation practiced by the members of the concerned group. Regardless of the nature of the crime alleged to have been committed by the defendant, there can be no justification for such unlawful conduct. Such conduct, apart from its illegality, is contrary to all acceptable norms of human behavior. It cannot be countenanced in any form. The rule of law and lawful procedures must be followed.

Having said this much, we must add that it is also the duty of this court to follow settled rules of law in its review of the facts of the case found by the trial judge. It is settled (and undisputed) that an appellate court cannot disturb the judge's findings of subsidiary facts if they are supported by the evidence. In like manner, this court may not draw inferences contrary to those of the trial judge which were derived from his subsidiary findings *and* from oral testimony. See *Glover* v. *Waltham Laundry Co.* 235 Mass. 330, 333 (1920). There is a very real and practical reason for the rule: The appellate court did not conduct the trial or the voir dire. It has neither heard the witnesses nor seen all of the evidence. It lacks the exposure to appearance and demeanor on the witness stand which assists the trial judge in his evaluation of veracity and resolution of conflicting testimony.

In the instant case, none of the dissenters is willing to say that the judge below was plainly wrong in his findings. Each purports to accept the basic "historical or subsidiary facts" found below but then reaches a result inconsistent with the trial judge's factual finding that the defendant was "completely free from fear" after the encounter with the hunters. Justice Kaplan returns to the record in order to divine the defendant's state of mind throughout the period following the departure from the

cabin. He concludes (contrary to the trial judge's findings) that "the defendant remained under the heel of the kidnappers" and that his "statements at the Sears parking lot were . . . made within a continuing constraint and compulsion." Justice Hennessey, while unwilling to draw these further inferences, nevertheless finds that the Commonwealth has not proved that the defendant's admissions were voluntary by a fair preponderance of the evidence. He refuses to be bound by the judge's "inference . . . that is synonymous with voluntariness."

Is it now open to this court to disregard the trial judge's findings and to come to a contrary conclusion? We think not. A decision as to the voluntariness of the defendant's admissions involves determination of his state of mind at the time they were made. State of mind is a question of fact. See *Kelley* v. *Jordan Marsh Co.* 278 Mass. 101, 106 (1932); *Commonwealth* v. *Holiday,* 349 Mass. 126, 128 (1965). It can be established by the defendant's direct testimony or through reasonable inferences drawn from other proved facts and demeanor evidence. In the instant case, the defendant testified directly to the precise question at issue — namely, his state of mind at the time he agreed to disclose the gravesite to the concerned group. He testified that he had agreed to lead the group to the body in order to get out of the cabin. He claimed that members of the group had told him that he would never leave the cabin alive if he did not tell them the location of the body. Thus, it was his story that fear engendered his cooperation with his captors, his disclosure of the gravesite and his other admissions. However, this testimony cannot be of any significance here and cannot be employed to support inferences contrary to those of the trial judge. The trial judge, who had the opportunity to observe all of the witnesses, evaluated the defendant's testimony and rejected it. The judge observed the defendant on the stand, his appearance and his mannerisms; the tone of his voice and his attitude as he was examined and cross-

examined; his facial expressions and his general de-
meanor.[33]   In short, the trial judge's primary function on
this issue (voluntariness) was to ascertain the defend-
ant's state of mind — whether he was telling the truth as
to the reasons he gave for his decision to reveal the
gravesite (and *as to his state of mind*).   The trial judge,
in rejecting the defendant's testimony, necessarily found
that he was not telling the truth.   This was a finding of
fact based on oral testimony of the defendant and of
other witnesses.   An appellate court cannot find to the
contrary.

This is not to say that merely because the judge
disbelieved the defendant's testimony he could, without
additional evidence, find the reverse to be true.   His
finding of the reverse must be supported by other
relevant evidence.   Here there was extensive testimony,
as fully delineated elsewhere in this opinion, tending to
demonstrate the change of mood and relationship found
by the judge below.   It was more than sufficient to
sustain the government's burden of proof.   The judge's
finding of voluntariness must stand.

### III. STATEMENT TO THE POLICE AT HOSPITAL — THE HARRIS vs. NEW YORK PROBLEM.

1. The judge quite properly suppressed all statements
made to the police in the Massachusetts General Hospital
on December 10 for purposes of the prosecution's case in
chief.   Police conduct at the hospital was clearly incon-
sistent with the standards for custodial interrogation
established by *Miranda* v. *Arizona,* 384 U. S. 436 (1966).
It is true that an officer read the requisite *Miranda*
warnings to the defendant and then requested that the
defendant read the *Miranda* warning card.   However,

---

[33] "The smile, the blush, the harsh or soft voice, the shrug, even the
dilation of a pupil may send a message and alter the tone of the trial.
Myriad subtle communications of our bodies are lost in the stenotype
machine."   Weinstein & Berger, Weinstein's Evidence (1975) iv.

none of the officers apprised the defendant of his lawyer's efforts to speak to Gawlinski or informed the attorney that a custodial interrogation of his client was in progress. Gawlinski, who was most familiar with the case and who knew both that the defendant had had counsel for many months and that counsel wished urgently to contact a responsible police official, conspicuously absented himself from the interrogation. The judge stated that "conduct on the part of prosecuting officers was at least heedless, if not deliberate, and I can conclude only that it was a course of conduct calculated to circumvent . . . [the defendant's] constitutional rights to have the benefit, aid, and counsel of his attorney."

The *Miranda* safeguards encompass more than a simple explanation to a suspect that he has a right to remain silent and a right to counsel. The suspect must "be afforded the opportunity to exercise these rights throughout the interrogation. . . . [H]e . . . [is] entitled to know of his counsel's availability and, with that knowledge, to make the choice [to forgo the benefits of counsel] with intelligence and understanding." *Commonwealth* v. *McKenna*, 355 Mass. 313, 324 (1969). In previous cases, we have noted that police may not thwart counsel who seeks to confer with a client (*Commonwealth* v. *McKenna*, *supra*, at 325-326) and have held inadmissible statements elicited by the police in the absence of counsel after an attorney has entered the case when no intentional and knowing waiver of the right to counsel was proved (*Commonwealth* v. *Murray*, 359 Mass. 541, 544-546 [1971]). Cf. *Commonwealth* v. *Cain*, 361 Mass. 224, 227-229 (1972). Similarly, in the instant case, the defendant's statements in the hospital were inadmissible for the prosecution's case in chief.

Nevertheless, we hold that the defendant's statements, if voluntary and trustworthy,[34] were available to impeach

---

[34] The question of voluntariness is considered *infra*. The defendant does not explicitly challenge the availability of these statements on the

his testimony if he took the stand.[35]  *Harris* v. *New York,*
401 U. S. 222 (1971), and *Oregon* v. *Hass,* 420 U. S. 714
(1975), are controlling.

In *Harris* v. *New York,* the defendant took the stand
and denied having sold heroin to an undercover officer.
On cross-examination, he was asked whether he had
made certain statements[36] to the police shortly after his
arrest.   The transcript of the interrogation showed that
the police had not advised the defendant of his right to
appointed counsel at the time.   Despite this infringement
of the *Miranda* safeguards (*Miranda* v. *Arizona, supra,*
at 444), the Supreme Court held that the statements had
been properly admitted to impeach the defendant's testi-
mony.   The court rejected the argument that under
*Miranda* "evidence inadmissible against an accused in the
prosecution's case in chief is barred for all purposes."
*Harris* v. *New York, supra,* at 224.   In the court's view,
a valid policy consideration, the possibility that the
defendant might deliver perjurious testimony, outweighed
the extra measure of deterrence to unconstitutional police
action which might be achieved by total exclusion of such
evidence.   Mr. Chief Justice Burger wrote for the court:
"Every criminal defendant is privileged to testify in his

---

ground that they are untrustworthy.   Indeed, the other evidence in
the case corroborates them.   Nevertheless, a claim of untrustworthi-
ness is implicit in the claim of involuntariness.   At common law,
coerced confessions were excluded from evidence because of their
inherent untrustworthiness.   Wigmore, Evidence, § 822 (a), p. 330
(Chadbourn rev. 1970).   See, e.g., *Commonwealth* v. *Morey,* 1 Gray
461, 462-463 (1854); *Commonwealth* v. *Myers,* 160 Mass. 530, 532
(1894); *Lisenba* v. *California,* 314 U. S. 219, 236 (1941).   Though
this is not the principal justification for exclusion of coerced con-
fessions under the due process clause of the Fourteenth Amendment,
the Supreme Court has noted "the probable unreliability of confessions
that are obtained in a manner deemed coercive."   *Jackson* v. *Denno,*
378 U. S. 368, 386 (1964).

[35] He did not testify at the trial before the jury.

[36] The statements had been suppressed for purposes of the prosecu-
tion's case in chief.

own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury . . . . The shield provided by *Miranda* cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances." *Id.* at 225-226. The court noted, however, that there had been no claim that the statements made to police were coerced or involuntary and that "the trustworthiness of the evidence [must] satisf[y] legal standards." *Id.* at 224.

In *Oregon* v. *Hass,* the court again spoke to the issue whether evidence obtained by the police without strict compliance with *Miranda* standards was admissible for impeachment purposes. After his arrest for bicycle theft, Hass was given the *Miranda* warnings. He admitted that he had stolen two bicycles but was uncertain which one was the subject of the investigation. He and a police officer then departed for the place where he had left one of the stolen bicycles. On the way, Hass commented that he "'was in a lot of trouble'" and wanted to telephone his attorney. The police officer replied that Hass could use the telephone after they returned to the "office." Thereafter, Hass guided the police officer to the bicycle and pointed out the locations of the houses from which he had stolen the two bicycles. At trial, Hass's statements to the police officer after his request for counsel were admitted only as to the credibility of his testimony. The Oregon Court of Appeals reversed his subsequent conviction and the Supreme Court of Oregon affirmed the reversal. The United States Supreme Court, on the authority of *Harris* v. *New York,* reversed. The court reiterated its concern that exclusionary rules could "free [the defendant] from the embarrassment of impeachment evidence from . . . [his] own mouth" (*Oregon* v. *Hass,* 420 U. S. 714, 723 [1975]) and emphasized, as it had in *Harris,* the valuable aid which the defendant's statements would provide to the jury in assessing his credibility. *Id.* at 721. The court found no

"valid distinction" between the situation in *Harris*, which involved defective *Miranda* warnings, a violation of a prophylactic rule,[37] and the situation in *Hass*, which involved the failure to afford a suspect his full constitutional right to counsel after his attempt to exercise that right.[38]  The court added, however, that "[i]f, in a given case, the officer's conduct amounts to abuse, that case, like those involving coercion or duress, may be taken care of when it arises measured by the traditional standards for evaluating voluntariness and trustworthiness." *Id.* at 723.

We believe the *Harris* and *Hass* exception to the exclusionary rule of *Miranda* and like cases permits introduction of the defendant's statements (if they are voluntary and trustworthy) to impeach his direct testimony.  Functionally,[39] the violation of the defendant's rights in the instant case is closely analogous to that in *Harris* and *Hass*.  In each case, the deprivation of rights stems from the failure of police to provide a suspect with counsel to

---

[37] In *Michigan v. Tucker*, 417 U. S. 433, 446 (1974), the court held that "police conduct at issue . . . [in the case] did not abridge respondent's constitutional privilege against compulsory self-incrimination, but departed only from the prophylactic standards later laid down . . . in *Miranda* to safeguard that privilege." The *Miranda* warnings are not themselves a constitutional requirement but are "safeguards" designed to "provide practical reinforcement for the right against compulsory self-incrimination." *Id.* at 444.

[38] The facts in *Hass* bear strong resemblance to those in *Escobedo v. Illinois*, 378 U. S. 478 (1964), which was argued on a Sixth and Fourteenth Amendment theory.  The right to counsel, which the defendant in *Hass* sought to effectuate under the Fifth and Fourteenth Amendments, is, of course, of equal constitutional dignity.

[39] We emphasize the functional similarity of the rights at issue because the cases, though analogous, proceed on a variety of different theories.  In the instant case, the defendant claims abridgment of rights under the Fifth, Sixth, and Fourteenth Amendments.  *Hass* was decided on Fifth and Fourteenth Amendment grounds.  The *Harris* opinion mentions only *Miranda* (and no specific constitutional amendment) and seems to foreshadow the description of *Miranda* warnings as prophylactic rules in *Michigan v. Tucker*.  See n. 37, *supra*.

whom he was entitled. Just as Harris received no assist-
ance from the appointed counsel to whom he was entitled
and Hass did not have a timely opportunity to consult
counsel whom he had requested, so the defendant here
did not benefit from the assistance of counsel who
urgently wished to reach him.

We are not persuaded that factual distinctions between
the instant case and *Harris* and *Hass* are sufficient to
shift the balance struck in the two Supreme Court cases
between impeachment of perjurious testimony and deter-
rence of improper police conduct. The exclusionary rules
fashioned in *Miranda* and like cases[40] deter "impermis-
sible police conduct" (see *Harris* v. *New York, supra,* at
225) by excluding from trial any evidence which was
improperly obtained. *Michigan* v. *Tucker,* 417 U. S.
433, 447 (1974). Cf. *United States* v. *Calandra,* 414
U. S. 338, 347 (1974). An exception to the exclusionary
rules in the instant case is no more an encouragement to
such misconduct (or a slackening of the deterrent effects
of the rules) than are the exceptions promulgated in
*Harris* and *Hass.* Such encouragement may be thought
to arise from the police officer's knowledge that a lawyer
will likely advise his client to make no statement while in
custody[41] and the further knowledge that a statement
elicited in the absence of counsel will at least be available
for impeachment of testimony.[42] Yet, in *Hass,*[43] where
the suspect had actually requested counsel and, thus, the

---

[40] Compare, however, the rationale for exclusion of coerced con-
fessions given at p. 680, *supra.*

[41] See the opinion of Jackson, J., in *Watts* v. *Indiana,* 338 U. S. 49,
59 (1949): "[A]ny lawyer worth his salt will tell the suspect in no
uncertain terms to make no statement to police under any circum-
stances."

[42] In *Hass,* the Supreme Court termed this a "speculative possi-
bility." *Oregon* v. *Hass, supra,* at 723.

[43] In the interest of brevity, we limit our examination of the bal-
ancing test to *Hass.* However, we note that *Harris* also supports
our holding here. See *United States ex rel. Wright* v. *LaVallee,* 471

incentive for continuation of interrogation without adherence to constitutional requirements, if there were an impeachment exception to the exclusionary rule, would be at a maximum, the court held that the interest in deterring such police conduct was outweighed by the general interest in impeachment of perjurious testimony. In the instant case, by contrast, the police could not know that the defendant would ask to see his attorney. If he had been informed that his attorney wished to see him, the defendant might have chosen to proceed without counsel — to reject the offer. After all, the police had "given" the defendant his *Miranda* warnings. He was aware of the fact that his parents had engaged an attorney to represent him. It was open to him at any time to halt the inquiry and request the attorney. Instead, the defendant intermittently asked for his parents and continued to answer questions when they did not arrive. In view of the uncertainty in the defendant's response to the information that his attorney wished to see him, an exception to the exclusionary rule in the instant case presents lesser incentives to police misconduct than were present in *Hass,* and there is a correspondingly less substantial interest in an exclusionary rule for deterrence.

Accordingly, we hold that, as in *Hass,* the interest in impeachment of perjurious testimony here outweighed the interest in deterrence of police misconduct and that those of the defendant's statements which were voluntary and trustworthy were properly available to impeach his testimony if he had taken the stand.

2. We think the judge was warranted in finding that the statements made by the defendant to the police at the hospital were voluntary.[44]

---

F. 2d 123 (2d Cir. 1972), cert. den. 414 U. S. 867 (1973); *United States ex rel. Padgett* v. *Russell,* 332 F. Supp. 41 (E. D. Pa. 1971).

[44] There was no claim of involuntariness or coercion in either *Harris* v. *New York,* 401 U. S. 222, 224 (1971), or *Oregon* v. *Hass,* 420

Having concluded that the defendant's post-4:15 P.M. statements to his abductors were separated from his earlier statements to them by a break in the stream of events and that these later statements were not made because the cat was out of the bag, we believe that the statements in the hospital were also sufficiently separated from the coercive conditions which had extracted the statements in the cabin and were also not the product of the cat-out-of-the-bag effect.    The statements in the hospital were elicited by different people, police officers uninvolved in the original abduction, in a different place. See *Lyons* v. *Oklahoma*, 322 U. S. 596, 602 (1944).   Cf. *Miranda* v. *Arizona*, 384 U. S. 436, 496 (1966).[45]   By the time of his questioning in the hospital, the defendant had had an opportunity to consult his family (cf. *Reck* v. *Pate*, 367 U. S. 433, 441 [1961]) and had been out of the control of his captors for quite some time (cf. *Beecher* v. *Alabama*, 389 U. S. 35, 38 [1967]; *Darwin* v. *Connecticut*, 391 U. S. 346, 349 [1968]).   It does not appear from the evidence that the statements in the cabin caused him to make admissions to the police.   As noted above, the defendant did not believe his statements could be used against him.   In the interrogation by police, he did not immediately confess, as might a man who felt he had

---

U. S. 714, 722.   However, as noted above, in *Hass*, the Supreme Court wrote:   "If, in a given case, the officer's conduct amounts to abuse, that case, like those involving coercion or duress, may be taken care of when it arises measured by the traditional standards for evaluating voluntariness and trustworthiness."   *Id.* at 723.   We assume without deciding that in the circumstances of this case we would not distinguish involuntary admissions from involuntary confessions for purposes of impeachment.   See *Commonwealth* v. *Harris*, 364 Mass. 236, 241 (1973).   Involuntary (and, hence, untrustworthy) confessions are not admissible to impeach a defendant's testimony.   *Commonwealth* v. *Kleciak*, 350 Mass. 679, 690 (1966).   *Commonwealth* v. *Harris*, *supra*.

[45] This is the discussion of *Westover* v. *United States*, one of the consolidated cases.

nothing to lose. Rather, he maintained some control over the session and answered only selected questions.

Further, we believe that the trial judge found correctly that the police interrogation, itself, did not overbear the defendant's will and did not extract an involuntary statement from him. The trial judge found the following significant subsidiary facts on ample evidence. The defendant is an intelligent and educated young man. See *Commonwealth* v. *Pratt*, 360 Mass. 708, 713-714 (1972); *Lisenba* v. *California*, 314 U. S. 219, 239-241 (1941). Cf., e.g., *Fikes* v. *Alabama*, 352 U. S. 191, 196 (1957); *Payne* v. *Arkansas*, 356 U. S. 560, 567 (1958). At the time of his interrogation, he was neither dazed nor bewildered (cf. *Leyra* v. *Denno*, 347 U. S. 556, 560 [1954]), nor drugged (cf. *Beecher* v. *Alabama*, 389 U. S. 35, 38 [1967]), nor too sick or weak to resist questioning (see *Commonwealth* v. *Sousa*, 350 Mass. 591, 598 [1966]; cf. *Reck* v. *Pate*, 367 U. S. 433, 443 [1961]; *Beecher* v. *Alabama, supra*). He was physically and mentally alert. Aside from the injury to his eye, he showed no evidence of physical disability or impairment of physical or mental functions. Before questioning commenced, the officers informed the defendant of his *Miranda* rights. See *Davis* v. *North Carolina*, 384 U. S. 737, 740 (1966); *Procunier* v. *Atchley*, 400 U. S. 446, 453 (1971). During the questioning, the police officers were courteous. They did not threaten the defendant (cf. *Harris* v. *South Carolina*, 338 U. S. 68, 70 [1949] [threat to the defendant concerning his mother]; *Beecher* v. *Alabama, supra*, at 36) or attempt to induce admissions by deception (cf. *Spano* v. *New York*, 360 U. S. 315, 323 [1959]). The questioning was not unduly lengthy or prolonged (cf. *Ashcraft* v. *Tennessee*, 322 U. S. 143, 153-154 [1944]; *Watts* v. *Indiana*, 338 U. S. 49, 53 [1949]; *Clewis* v. *Texas*, 386 U. S. 707, 709 [1967]) and, throughout the questioning, the defendant maintained the above mentioned control over the proceedings (see *Commonwealth* v. *Cook*, 351 Mass. 231, 235

[1966], cert. den. 385 U. S. 981 [1966]; *Stein* v. *New York*, 346 U. S. 156, 186 [1953]). At his insistence, the stenographer was dismissed. He did not answer every question, but chose those to which he would reply.

In these circumstances, we cannot say that the statements which finally emerged were involuntarily given. Accordingly, the statements were properly ruled available for impeachment of testimony under the rule of *Harris* and *Hass*.

IV. REVIEW PURSUANT TO G. L. c. 278, § 33E.

Having determined that there was no constitutional error in the admission of evidence at trial, we turn now to the additional review of the record and law which is our duty in all capital cases.[46]  General Laws c. 278, § 33E, as amended through St. 1974, c. 457, provides in relevant part, "In a capital case . . . the supreme judicial court shall transfer to that court the whole case for its consideration of the law and the evidence. Upon such consideration the court may, if satisfied that the verdict was against the law or the weight of the evidence, or because of newly discovered evidence, or for any other reason that justice may require (*a*) order a new trial or (*b*) direct the entry of a verdict of a lesser degree of guilt, and remand the case to the superior court for the imposition of sentence." The statute "gives us the power and duty exercised by a trial judge on a motion for a new trial" (*Commonwealth* v. *Baker*, 346 Mass. 107, 109 [1963]) but also reserves for our consideration the broader issue whether the verdict rendered represents a miscarriage of justice or whether a lesser degree of guilt

---

[46] The statute defines a "capital case" as one in which "the defendant was tried on an indictment for murder in the first degree and was convicted of murder either in the first or second degree." G. L. c. 278, § 33E.

would be more consonant with justice. *Commonwealth v. Baker, supra. Commonwealth* v. *Williams,* 364 Mass. 145, 150 (1973). See *Commonwealth* v. *Jones,* 366 Mass. 805, 809 (1975). This latter power is a power which the trial court does not have. *Commonwealth* v. *Baker, supra. Commonwealth* v. *Bearse,* 358 Mass. 481, 485 (1970).

The record before us contains little direct evidence from which a finder of fact could construct an account of the events which immediately preceded the victim's death. There were no witnesses to the conversation and violence between the victim and the defendant. The jury undoubtedly reached their verdict, a verdict warranted by the evidence, by drawing a chain of inferences from the relationships among the witnesses, the defendant and the victim and from the defendant's statements and actions immediately before and simultaneously with the discovery of the body. The principal direct evidence concerning the killing, the defendant's admissions to members of the concerned group in the cabin and to the police in the hospital, was, of necessity, excluded from the trial and had no place in the jury's deliberations. This evidence, itself, is suspect because of the coercive circumstances in which the admissions were elicited (see *Jackson* v. *Denno,* 378 U. S. 368, 386-388 [1964]) and the subsequent implicit repudiation of the admissions by the defendant in his voir dire testimony.

Nevertheless, despite this relative paucity of reliable direct evidence concerning the victim's death, we believe that justice requires that we reduce the verdict of murder in the second degree to manslaughter. The thrust of the evidence is that the killing lacked the element of malice aforethought necessary to support a verdict of murder.

In reaching this conclusion, we rely in large measure on the account of the killing given by the defendant to the concerned group in the cabin. Although this evidence was correctly excluded from the jury's consideration, it may be considered by us in the exercise of our

authority under G. L. c. 278, § 33E.[47] Cf. *Common-wealth* v. *Smith,* 357 Mass. 168, 182 (1970). To repeat (see p. 671, *supra*), the defendant's story was that, after an argument, the victim provoked him with a slap which he answered impulsively and angrily with a return blow. Her death then followed in an unexpected manner as she fell and hit her head on the curb. This version of the events will not support a finding of malice aforethought. The defendant never formed a specific intention to kill the victim. Rather, he struck in almost-reflexive response to her provocation, and such passion as he felt did not achieve the intensity of a desire to kill. Though the defendant undoubtedly intended to inflict some injury on the deceased, this intention was "palliated by the existence of . . . [the] mitigating circumstances" (*Commonwealth* v. *Mangum,* 357 Mass. 76, 85 [1970]) repre-sented by the prior slap and provocation. Nor could death reasonably be expected to follow the defendant's blow. "'[A]ccording to common experience'" there is no "'plain and strong likelihood that death will follow'" a simple blow with the hand administered to a healthy adult[48] — even if the victim is standing on slippery,

---

[47] We have said repeatedly that the statute "requires us to consider the *whole case broadly* to determine whether there was any mis-carriage of justice" (emphasis supplied). *Commonwealth* v. *Cox,* 327 Mass. 609, 614 (1951). Accord, *Commonwealth* v. *Gricus,* 317 Mass. 403, 407 (1944); *Commonwealth* v. *Baker,* 346 Mass. 107, 109 (1963); *Commonwealth* v. *Williams,* 364 Mass. 145, 150 (1973). Moreover, G. L. c. 278, § 33E, provides specifically that this court may direct the entry of a verdict of a lesser degree of guilt "if satisfied that the verdict was against the law or the weight of the evidence . . . or for *any other reason* that justice may require" (emphasis sup-plied).

[48] "But where death ensues from acts or means which, under the circumstances, could not have been supposed to endanger life or to inflict great bodily injury, the law will not imply malice, because it cannot be reasonably inferred that the party charged intended the consequences which flowed from his act. If therefore death should ensue from an attack made with the hands and feet only, on a person of mature years and in full health and strength, the law would not

rain-spattered pavement. See *Commonwealth* v. *Mangum, supra; Commonwealth* v. *Chance,* 174 Mass. 245, 252 (1899); *Commonwealth* v. *Gordon,* 307 Mass. 155, 158 (1940). Cf. *Commonwealth* v. *Gricus,* 317 Mass. 403, 411 (1944). Such a battery which causes death is manslaughter. *Commonwealth* v. *Sostilio,* 325 Mass. 143, 145 (1949). *Commonwealth* v. *Campbell,* 352 Mass. 387, 397 (1967). See, generally, Perkins, A Reexamination of Malice Aforethought, 43 Yale L. J. 537, 552-555 (1934).

Although other reconstructions of the events of that night are possible and some will support a finding of malice, we have accepted the defendant's story, in so far as it precludes a finding of malice aforethought and suggests an accidental, unintended death, because it comports well with the other evidence concerning the defendant, the victim, and their relationship. The defendant appears to be a reasonably normal, mature and intelligent engineering student.[49] In his life prior to the evening of the victim's death,[50] he had not manifested any violent tendencies and had not had any prior involvement with the law. His ongoing relationship with the victim was of some duration and was characterized, it seems, by reciprocal affection. Although the smooth continuation of the relationship was evidently disturbed by the victim's trip to California, her relationship with a man there, and the defendant's consequent jealousy, there is no evidence in the record that his feelings of jealousy had so overmastered his affectionate inclination toward the victim that he would at any time have con-

---

imply malice, because ordinarily death would not be caused by the use of such means." *Commonwealth* v. *Fox,* 7 Gray 585, 588 (1856).

[49] The judge below implicitly found this.

[50] Statements about the defendant's prior life must be limited by the state of the record, which is relatively uninformative in this respect. We assume the accuracy of the statements in the text in the absence of contrary information.

sidered taking steps to bring about her death. Certainly, there is no substantial indication[51] in the record that he went to their meeting that night with the premeditated intent to kill or to employ violence against the victim. Cf. *Commonwealth* v. *Kendrick*, 351 Mass. 203, 210-211 (1966). Further, there is no indication that their relationship had so deteriorated that he would have undertaken to kill or attack savagely the object of his affections even if he had been enraged at being asked to bear the consequences of her infidelity — a pregnancy. In the context of their relationship, the defendant's story of one hasty unfortunate blow rings true.

The case is remanded to the Superior Court where the verdict of murder in the second degree and the sentence previously imposed are to be vacated. A verdict of guilty of manslaughter shall be entered and sentence shall be imposed thereon.

*So ordered.*

---

[51] At trial, the assistant district attorney termed the killing a "cold, calculated murder" and asked the jury to return a verdict of murder in the first degree. In support of his request, he directed the jury's attention specifically to the love beads worn by the victim (acquired while she was in California), to the lengths of rope which bound the body in two places, to the blanket in which the body was wrapped, to the grave in which the body was buried and to the defendant's silence for fifteen months about the circumstances of the victim's death. While these facts may support an inference of premeditation and preparation, they certainly do not provide substantial proof of an intentional killing.

KAPLAN, J. (with whom Wilkins, J., joins, dissenting). The record of this case discloses a dangerous vigilantism, not to be condoned even if it began out of understandable feelings of frustration. The response of the police detective in charge of the official investigation to these private activities was maladroit or worse.[1] Later, the same officer and others deliberately obstructed counsel's access to the defendant when the defendant had dire need of advice. At a trial following such events, constitutional protections should have been accorded to the accused with particular scruple. The able trial judge tried conscientiously to give the accused his constitutional due, but I think two of his rulings were faulty. The rulings were (I) that the statements made by the defendant to his kidnappers at the Sears parking lot around 6:30 P.M. on December 9, 1971, were voluntary and thus admissible, and (II) that the Commonwealth could use for impeachment purposes the statements made by the defendant to the police at the hospital early the following morning, at a time when the defendant's counsel was being kept from him by the police. Because the court upholds these rulings, I am obliged to dissent.

I

This case must be the first in our jurisprudence in which incriminating statements, made by a kidnapped person to his kidnappers while still in their grip, have been adjudged to be acts of free will. How does the court justify such an extraordinary conclusion here?

All members of this court accept the basic facts — the historical or subsidiary facts — as found below. The dispute is as to the conclusions to be drawn from those facts, a matter on which this court, as an appellate court dealing with constitutional rights, is required to make its own independent judgment. See *Commonwealth* v.

---

[1] See n. 9, *infra.*

*Murphy,* 362 Mass. 542, 550-551 (1972)[2] (concurring opinion of Hennessey, J.); *Napue* v. *Illinois,* 360 U. S. 264, 271-272 (1959).[3]   The majority of this court reach

---

[2] At part II, section 4, of its opinion, the court chides this dissent for refusing to accept the trial judge's findings and in effect adopting contrary findings.   The criticism is misdirected and ignores constitutional requirements.   As will be evident, we do indeed differ from the trial judge in his "finding" (quoted by the court) that the defendant was "completely free from fear."   But to call that and similar statements by the trial judge subsidiary findings and thereby to foreclose reexamination of them here would subvert the process of review in constitutional cases.   Those statements are merely reformulations in other words of the judge's conclusion that the defendant acted voluntarily after 4:15 P.M., and are the very constitutional issue that must be reassessed by this court.   Particularly pertinent is the closing remark in the following passage by Hennessey, J., concurring in the *Murphy* case, cited in the text:   "[T]he *ultimate* findings and rulings of a judge may give rise to a meaningful appeal, even in a case where his subsidiary findings are beyond practical challenge.   This is true because the ultimate conclusions of a judge on identification issues may be of constitutional proportions.   This court must, where justice requires, substitute its judgment for that of a trial judge at the final stage. . . . The mere recital of appropriate phrases denoting constitutional acceptability may serve only to obscure error in admitting the evidence."   362 Mass. at 551.   See Frankfurter, J., in *Watts* v. *Indiana,* 338 U. S. 49, 50-51 (1949), and *Culombe* v. *Connecticut,* 367 U. S. 568, 603-606 (1961).

[3] The court said in *Napue*:   "The duty of this Court to make its own independent examination of the record when federal constitutional deprivations are alleged is clear, resting, as it does, on our solemn responsibility for maintaining the Constitution inviolate.   *Martin* v. *Hunter's Lessee,* 1 Wheat. 304 [1816]; *Cooper* v. *Aaron,* 358 U. S. 1 [1958].   This principle was well stated in *Niemotko* v. *Maryland,* 340 U. S. 268, 271 [1951]:   'In cases in which there is a claim of denial of rights under the Federal Constitution, this Court is not bound by the conclusions of lower courts, but will reexamine the evidentiary basis on which those conclusions are founded.'   It is now so well settled that the Court was able to speak in *Kern-Limerick, Inc.* v. *Scurlock,* 347 U. S. 110, 121 [1954], of the 'long course of judicial construction which establishes as a principle that the duty rests on this Court to decide for itself facts or constructions upon which federal constitutional issues rest.'   As previously indicated, our own evaluation of the record here compels us to hold that the false testimony used by the State in securing the conviction of petitioner may have had an effect on the outcome of the trial."   See *Drope* v. *Missouri,* 420 U. S. 162, 174 (1975).

their conclusion by a train of reasoning that declines to acknowledge the natural inferences flowing from the subsidiary facts, and constructs instead a wholly speculative theory to explain the defendant's behavior.

That the statements given up to 4:15 P.M. of December 9 were coerced, is not disputed. But we have to sum up the circumstances of that coercion because they bear on the defendant's situation when he made the further statements two hours later.

A large number of hostile pursuers, all the more fearsome because not quite identifiable, had been harassing the defendant over a period of fifteen months, making threatening appearances at unpredictable times at his home, school, and places of work. The insistent surveillance broke out into episodes instinct with violence. Toward the end the defendant would have ground for believing that his tormentors had already convicted him of murder and sought only an opportunity to enforce their own law. Finally came the kidnapping at Mt. Ida. The physical hurt was compounded by the uncertainties of a long trip to an unknown destination. Arrival in the dead cold of winter at an isolated, snowbound place must further have shaken the defendant. The threat of the bread knife was upon him throughout the night.

Starting in the early morning and for some six to eight hours the defendant was questioned by three and then five antagonists whose determination to break him may have been intensified by an apprehension that they could not "justify" the kidnapping, if called to account for it, unless they managed to extract some tangible results. This may have underlain the severity of the questioning: in any event, it was extended, repetitious, nagging, interspersed with extremely rough language and threats to take the defendant's life, threats that he would never leave the place alive. In confronting this inquisition, the defendant was alone, without benefit of friends or advice. At length, the defendant's will was broken. He made incriminating statements to Ferreri and Campbell.

It is conceded that these statements were coerced. But the defendant still withheld the revelation of the exact location of the body. Instead he offered to lead Ferreri to the gravesite. The kidnappers debated the defendant's offer; only after argument among themselves (Ferreri pressing one view and Fontacchio and Heard the other) did they decide to accept the offer and take the defendant with them to Boston, rather than to continue to hold him at the cabin until he revealed the location of the gravesite and the information could be verified. But the defendant was not to be released until the body was found. Thus, the kidnapping and imprisonment were not brought to an end by the defendant's initial statements at the cabin, but would continue until he satisfied his captors' ultimate demand. On these facts, I conclude that the defendant's acceptance of the condition that he reveal the gravesite was as much coerced as his initial statements. His statements at the Sears parking lot were thus made within a continuing constraint and compulsion.[4]

In light of the natural conclusion from the subsidiary facts that the defendant remained under the heel of the kidnappers through the 6:30 P.M. statements, it may be unnecessary to apply those tests which have been used in more doubtful cases to measure how far coercion or illegality has been attenuated by later events. But if those tests are applied here, the conclusion is reinforced.

As to whether there has been an insulating "break in the stream of events" between successive statements, the cases point to certain central, objective considerations. Among these — besides the elementary question of the length of time between the statements, here quite short — are the factors: whether in the interval the defendant

---

[4] See the distinction suggested in *Commonwealth* v. *McGarty*, 323 Mass. 435, 438 (1948), between an officer's saying to a suspect during questioning that he will not be beaten, and the officer's saying he will not be beaten if he confesses to the crime. See also *Commonwealth* v. *Femino*, 352 Mass. 508, 514 (1967).

had an opportunity to see his family or friends (*Reck v. Pate,* 367 U. S. 433, 444 [1961]), or to consult with counsel (*Darwin v. Connecticut,* 391 U. S. 346, 349 [1968]; *Clewis v. Texas,* 386 U. S. 707, 709, 711 [1967]); whether he has been throughout the period continuously in the hands of those who obtained the first statement (*Beecher v. Alabama,* 389 U. S. 35, 38 [1967]); and whether the later statement was given to the same persons as the original, coerced statement. (*Lyons v. Oklahoma,* 322 U. S. 596, 604 [1944].) According to these objective indicators, there is no basis for discovering here a material break in the stream of events.

Next, as to "cat-out-of-the-bag," we observe that by 4:15 P.M. the defendant had already made statements involving himself in the death of the victim; he had not divulged the exact location of the grave, but he had given up its approximate location. The main secret was out. There is nothing to suggest that the defendant knew that under the law his statements to that point were inadmissible; indeed, such mention as the defendant is supposed to have made of his chances in case of trial indicate that he thought his statements could and would be used against him. But if he believed that his first statements were beyond recall — and realistically they were, regardless of their exact legal position at trial — the defendant would see little point in withholding the rest of his story. So the conclusion is well justified that the coercion which produced the pre-4:15 P.M. statements was also the cause of the post-4:15 statements. And here, to repeat, we have the added, overriding factor that the defendant was under great continuing pressure to make the final disclosure of the gravesite as a means of getting free of the kidnappers.

My assessment of the subsidiary facts seems to me within the reasoning of the passage from Mr. Justice Jackson in *United States v. Bayer,* 331 U. S. 532, 540 (1947), and the remarks by Mr. Justice Harlan in *Darwin v. Connecticut,* 391 U. S. 346, 350-351 (1968), quoted by

Commonwealth v. Mahnke.

the court.[5]    Again, in *United States* v. *Gorman*, 355
F. 2d 151, 157 (2d Cir. 1965), cert. den. 384 U. S. 1024
(1966), the Second Circuit considered a "situation in
which, after a first confession has been extracted from a
man previously professing innocence by means calculated
to break his will, a second confession is more politely
secured." Judge Friendly wrote, "In such a case, there is
a strong basis both in logic and in policy for drawing the
inference that the second confession was the product of
the first, and for permitting that inference to be over-
come only by such insulation as the advice of counsel or
the lapse of a long period of time." Compare *Fisher* v.
*Scafati*, 439 F. 2d 307, 310-311 (1st Cir. 1971), cert. den.
403 U. S. 939 (1971), where Chief Judge Aldrich sug-
gested that *Miranda* warnings after a first invalid con-
fession may not themselves make a second confession ad-
missible unless accompanied by advice about that prior
invalidity and inadmissibility.[6]

There is analogy in a case decided by the Supreme
Court last term, *Brown* v. *Illinois*, 422 U. S. 590 (1975).
After a warrantless arrest without probable cause, the de-
fendant was given *Miranda* warnings and then, about
9 P.M., made an inculpatory statement. The defendant
then went with the police to look for an alleged con-
federate, Claggett, and at 3 A.M. the next morning, after

---

[5] See, further, Stewart, J., in *Harrison* v. *United States*, 392 U. S.
219, 224-226 (1968), and Harlan, J., dissenting in the same case and
further explaining his position in the *Darwin* case. 392 U. S. at 227,
note. See also *Ruffin* v. *United States*, 293 Atl. 2d 477, 480-481
(D. C. App. 1972).

[6] It may serve in some measure to explain the trial judge's error in
admitting the post-4:15 statements, that in his original findings he
omitted entirely to deal with the factor of "cat-out-of-the-bag" and
paid insufficient attention to the factor of "break in the stream of
events." Accordingly, this court entered an order directing the trial
judge to address himself to these two factors. The judge's "supple-
mentary findings" do not add to the subsidiary facts and asseverate
his earlier conclusions without adding any fresh appreciation of the
defendant's predicament before or after 4:15 P.M.

repeated *Miranda* warnings, gave a second statement. The court held that the illegal arrest vitiated the defendant's first statement despite the warnings: "Brown's first statement was separated from his illegal arrest by less than two hours, and there was no intervening event of significance whatsoever." 422 U. S. at 604. *As* to the second statement, the court said of it that it was "clearly the result and the fruit of the first." *Id.* at 605. "The fact that Brown had made one statement, believed by him to be admissible, and his cooperation with the arresting and interrogating officers in the search for Claggett, with his anticipation for leniency, bolstered the pressures for him to give the second, or at least vitiated any incentive on his part to avoid self-incrimination." *Id.* at 605, n. 12.[7]

In the present case, the problem for the trial judge, and for this court in following him, was how to reconcile a conclusion that the defendant's statements after 4:15 P.M. were voluntary, with (a) the earlier conceded coercion by the kidnappers, (b) the effect on the defendant's mental state of his having made the initial confession, (c) the determination by the kidnappers, well understood by the defendant, to hold the defendant until he completed his confession by revealing the gravesite, and (d) the kidnappers' possession and control of the defendant until he actually did so. The trial judge and the

---

[7] This court took a similar approach in *Commonwealth* v. *Spofford,* 343 Mass. 703 (1962), a case involving not the admissibility of a subsequent confession, but rather the effectiveness of a consent for a search, given after a prior illegal search had turned up incriminating evidence, as the defendant knew. We emphasized that, given the prior search and its consequences, the defendant was "in no environment to make a free choice," and held that the consent obtained was "an offshoot of the original unreasonable search and seizure" and so did not validate the subsequent search. 343 Mass. at 707, 708.

That *Brown* and *Spofford* both relate to an inquiry into the lasting effect of a Fourth Amendment violation, while the case at bar involves a Fifth Amendment violation, is of no consequence for our inquiry, as the court appears to recognize. See, *supra,* 688, n. 32.

court have responded to this challenge by simply intro-
ducing a kind of *deus ex machina*:   they assert that a
sudden and complete change occurred after the initial
statements; with the cessation of overt intimidation on
the part of the kidnappers, the defendant abruptly
became friendly and trustful toward them, so that his
actions and statements thereafter were manifestations of
his free will, uninfluenced by the previous coercion.   In
attempted support of this inference, the court seizes upon
a number of incidents after 4:15 P.M.   With occasion to
cry out to the two hunters or at the toll stations on the
way back to Boston, the defendant remained silent.
Similarly, the defendant made no attempt to attract the
attention of passersby at the parking lot, and did not
seize any opportunities to escape that may have presented
themselves while he was descending to the tracks and
returning (with the advantage of the open penknife).   It
is said that the defendant warmed to Ferreri and spoke of
those to whom he first confessed as his "friends," he took
credit with Ferreri for not appealing to the hunters, and
he contributed some change to pay a toll.   Just before
reaching the parking lot, he volunteered to Ferreri an
indication of the bus stop figuring in his confession, and
later talked easily to Heard about his legal chances.
Even so, we encounter the fact that during the ride to
Boston the defendant secretly unscrewed the door lock
plunger on his side of the car in order to provide himself
with physical proof that he had been kidnapped; he
complained that the GTO automobile was bugged; and
he resisted the walk down the path.

   All this behavior does not lead to the inference that the
defendant was free of compulsion or of its effects; on the
contrary, his behavior is entirely consistent with a broken
will and indeed is to be expected from one in that condi-
tion.   As was said in a case where a defendant had been
intimidated and beaten by private parties and shortly
thereafter made statements to the police:   "Torture
destroys not only physically but psychologically.   Ele-

ments of despair, fatigue, craving for companionship, identifying one's interrogator as a friend and source of aid,[8] and suggestions of guilt were all present in a crude, haphazard form in this case." *People* v. *Berve,* 51 Cal. 2d 286, 292 (1958). It is all too easy, reading this record in retrospect, with control of one's faculties and with time and capacity to think clearly, to point out one or another moment when the defendant might have escaped. But such heroics are more likely in the movies than in real life. If the defendant had the ability to think of escape, he might also have thought that it would only result in recapture by the five vigorous young men or ultimately by others of the concerned group. In all probability, planning escape was out of the question for the defendant. Suffering from the bewildering and frightening events since his abduction, and already deeply committed by the pre-4:15 statements, he most likely was incapable of further resistance, though he might yet retain sufficient presence of mind for such sporadic acts as taking the door lock plunger. At the same time, the facts demonstrate that the defendant was not beyond some gestures to ingratiate himself with his tormentors; it may be inferred that he felt these a means of preventing further mistreatment or of gaining his final release. Once he had told his story, the "cat-out-of-the-bag" syndrome explains his telling it again, and his further remarks to Heard were nothing but self-comforting braggadocio. Any inference that the defendant was lighthearted after 4:15 p.m. because he thought the kidnappers accepted his story of a blow struck in anger, is dispelled when we note that, even if that statement were believed, the defendant would still be in very serious trouble: consider here his admission, as part of the story,

---

[8] This warming of the pursued toward his pursuer appears in imaginative literature in the relation of Jean Valjean to the detective Javert in *Les Miserables,* and of Raskolnikov to police inspector Porfiri Petrovich in *Crime and Punishment.*

that he had deliberately concealed the body, and then suppressed the truth for fifteen months.

In evaluating the historical facts to reach a conclusion, we should recall that it is not the defendant's burden to establish that his statements were coerced; the burden is on the government to prove the contrary, that the statements were freely willed. *Jackson* v. *Denno,* 378 U. S. 368, 376-377 (1964). *Lego* v. *Twomey,* 404 U. S. 477, 489 (1972). It is submitted that the inference of abrupt and total transformation of the defendant, from hostility and resistance to an attitude of voluntary cooperation, simply is not made out on the basis of the historical facts. Rather, the most modest conclusion that emerges from the facts is that the post-4:15 P.M. statements were substantially conditioned and influenced by the coercion directed at the defendant throughout the period during which he was held.

## II

The police conduct surrounding the questioning of the defendant at the M. G. H. on the morning of December 10 violated the defendant's constitutional right to the assistance of counsel. The trial judge so held, and the court concedes the point. When the questioning began, Detective Gawlinski, in charge of the case,[9] knew that

---

[9] Gawlinski's earlier connection with the case sheds light on his actions and motivation during the hospital interrogation.

Gawlinski knew of the extensive surveillance of the defendant by the concerned group and he also became aware of the exacerbated incidents such as the one at Henry F. Bryant & Son, Inc., which ended in a physical encounter, with Ferreri or Fontacchio saying, "George, we know what you did and you're going to pay for it," and "You think you got away with it this time but you didn't — we'll get you," or words to that effect. Yet Gawlinski took no decisive action against any of this activity. His attitude is further illustrated by an incident that occurred in July, 1971. Arthur M. Pascal, a private investigator employed by the father of the victim, learned that Erwin

the defendant's counsel was trying to reach him. Yet he neither took steps to inform the defendant of that fact nor returned counsel's calls; instead he tried in a highly suspicious (if clumsy) way to conceal or avoid his responsibility for this breach of the Constitution by absenting himself from the interrogation that he knew to be going on.[10]    There was, then, in the words of the trial judge, "a course of conduct calculated to circumvent . . . [the defendant's] constitutional rights," conscious "treading on constitutional thin ice," "deception and circumvention" by the principal investigating officer.

Nevertheless, the trial judge ruled that the statements obtained at the hospital could be used for impeachment purposes if the defendant testified in his own defense, and the court affirms. I think the ruling is not required by the decided cases and is fundamentally wrong. I could, with some difficulty, sympathize with such a decision if the violation of constitutional right involved was accidental or of a minor or technical nature. Here it was deliberate and of serious consequence.

---

Katz, a "concerned" person, was planning to "pick up" or "kidnap" the defendant for questioning at which the father would be present. Pascal called Gawlinski to ask whether Gawlinski had given Katz the "green light" (as Pascal had been told by others); Pascal pointed to the danger of violence by the father. Gawlinski indicated that he knew what was going to be done, yet insisted simply that there should be no "rough stuff"; if there was, he said, he would prosecute. The illegality and violence latent in the entire situation might have been more evident to an independent police officer. Gawlinski's independence, however, had been impaired by his too close association with the father and brother; it is symptomatic that Gawlinski's many meetings with the father took place at the father's residence rather than in official quarters. Gawlinski's hunger for results — for leads from any source — evidently overcame his respect for legality and orderly behavior. It comes, then, as no surprise that Gawlinski engineered to prevent the defendant from seeing his counsel on the morning of December 10.

[10] In fact, Detective Sheehan, who did participate in the interrogation, also knew that counsel had been trying to reach Gawlinski.

The court rests its conclusion on two cases, *Harris* v. *New York*, 401 U. S. 222 (1971), and *Oregon* v. *Hass*, 420 U. S. 714 (1975). Neither is a sufficient prop. In *Harris* (a five to four decision), the Supreme Court held that, notwithstanding the failure of the police to give full *Miranda* warnings (Harris was told of his right to counsel, but not of his right to court-appointed counsel), a statement obtained during custodial interrogation could be used for impeachment when Harris testified in his own behalf at trial. Weighing the promotion of truth through allowing the impeaching use of the statement, against the possible added deterrence of police misconduct that would flow from denial of such use, the court thought the truth-seeking interest prevailed. It is a ground for distinguishing the *Harris* case from the present that *Harris* did not involve the direct violation of a constitutional right but only the violation of a prophylactic rule safeguarding the right.[11] Beyond that, however, it is vital to observe that the questioning in *Harris* took place before *Miranda* was decided, so that the violation of the defendant's right was unintentional.

We followed *Harris* v. *New York* in *Commonwealth* v. *Harris*, 364 Mass. 236, 239-240 (1973). In doing so, we took note of the objections raised by the dissenters in *Harris* v. *New York*,[12] and quoted from *Riddell* v. *Rhay*, 404 U. S. 974, 976 (1971) (Douglas, J., dissenting from denial of certiorari): "[T]he possible use of tainted statements . . . opens the door to a calculated risk by police

---

[11] See *Michigan* v. *Tucker*, 417 U. S. 433, 443-444 (1974); *Michigan* v. *Payne*, 412 U. S. 47, 53 (1973).

[12] See *Harris* v. *New York*, 401 U. S. at 226-232 (Brennan, J., dissenting). Adverse commentary on the Supreme Court's decision in *Harris* was copious and severe. See, e.g., Dershowitz & Ely, *Harris* v. *New York*: Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority, 80 Yale L. J. 1198 (1971); The Supreme Court, 1970 Term, 85 Harv. L. Rev. 40, 44 (1971); 10 Duquesne L. Rev. 128 (1971); 40 Fordham L. Rev. 394 (1971); 45 Temple L. Q. 118 (1971); 33 Pitt. L. Rev. 135 (1971).

interrogators." The risk referred to is that involved in intentionally violating constitutional rights in hopes that damaging statements will be obtained useful for impeachment. We said, "The present case does not require us to enter into this dispute. . . . [T]he record is entirely barren of any indication that police or prosecutor took any 'calculated risk'; there seems rather to have been an inadvertent defect in the *Miranda* warnings given." Thus it is evident that neither *Harris* v. *New York* nor our own *Commonwealth* v. *Harris* reaches the present case which is the paradigm of police deliberateness and calculation in infringing constitutional rights.

The court argues also from *Oregon* v. *Hass*. That case posed the question (in the words of the Supreme Court): "When a suspect . . . states that he would like to telephone a lawyer but is told that this cannot be done until the officer and the suspect reach the station, and the suspect then provides inculpatory information, is that information admissible . . . for impeachment purposes . . .?" 420 U. S. at 714-715. The Supreme Court held (six to two) that it was admissible, as long as no "abuse" occurred making the statement involuntary or untrustworthy. Hass was arrested at his home for bicycle theft, and, after full *Miranda* warnings, agreed to show the police where he had left the bicycle. "[The police officer] and Hass then departed in a patrol car for the site. . . . On the way Hass opined that he . . . would like to telephone his attorney . . . . [The officer] replied that he could telephone the lawyer 'as soon as we . . . [get] to the office.' . . . Thereafter . . . [Hass] pointed out a place . . . where the bicycle was found." 420 U. S. at 715-716.

The Supreme Court avoided characterizing the police violation of Hass's rights as either accidental or deliberate. If the sketchy facts are read as implying that the police acted in good faith, or at least without design to evade the Constitution, then the case is like *Harris* v.

*New York* and, like that case, does not reach the present situation. Two recent Supreme Court cases, decided since *Harris* v. *New York*, suggest that *Hass* should be so interpreted.

In *Michigan* v. *Tucker*, 417 U. S. 433 (1974), a defendant, not informed of his right to appointed counsel, made a statement which led the police to a witness. In holding that the witness was properly allowed to testify, Mr. Justice Rehnquist wrote that "[w]e consider it significant to our decision in this case that the officers' failure to advise respondent of his right to appointed counsel occurred prior to the decision in *Miranda*." He explained that "[t]he deterrent purpose of the exclusionary rule necessarily assumes that the police have engaged in willful, or at the very least negligent, conduct which has deprived the defendant of some right. By refusing to admit evidence gained as a result of such conduct, the courts hope to instill in those particular investigating officers, or in their future counterparts, a greater degree of care toward the rights of an accused. Where the official action was pursued in complete good faith, however, the deterrence rationale loses much of its force." 417 U. S. at 477. See the discussion of the case at 27 U. of Fla. L. Rev. 302, 309-310 (1974).

Emphasis on the importance of good-faith behavior of the police, as a factor in decision as to admitting or rejecting a suspect's statement, appears also in *Brown* v. *Illinois*, 422 U. S. 590 (1975). This came three months after *Hass*; both were written by Mr. Justice Blackmun. Setting out the considerations with regard to admitting or excluding a statement made after an arrest which violated the Fourth Amendment, the Justice said that the giving of *Miranda* warnings after the arrest was "an important factor . . . [b]ut . . . [t]he temporal proximity of the arrest and the confession, the presence of intervening circumstances . . . and, particularly, the purpose and flagrancy of the official misconduct are all relevant."

422 U. S. at 603-604.[13]   It seems unlikely that a court which singled out for emphasis "the purpose and flagrancy of the official misconduct" in one case analyzing whether an exclusionary rule should be applied, would totally ignore the presence of purposeful and flagrant misconduct in another case also dealing with exclusion. Thus the failure of the *Hass* majority to weigh the deliberateness and seriousness of the police conduct in the case before it suggests that they believed no deliberate police misconduct — or at least no very invidious deliberate police misconduct — was present.[14]

Presumably this court disagrees and sees in *Hass* more than a casual misprision in that the police continued the patrol car on its course to the area of the crime, rather than turning it back to the station, at the moment when the suspect stated his desire for counsel.   This court then takes the *Hass* case a step further and reads it as covering also as aggravated a situation as we find in the case at bar.

*Hass,* if interpreted to cover intentional interference by the police with suspects' access to counsel, would en-

---

[13] The concurring opinion of Mr. Justice Powell, in which Mr. Justice Rehnquist joined, developed at some length the distinction between "technical" and "flagrant" violations of the Fourth Amendment and the consequences of the distinction on the admission or exclusion of statements later given.   422 U. S. at 606.

[14] The flagrancy of official misconduct as a determinant of whether a statement should be suppressed is also adopted by the A.L.I.'s Model Code of Pre-Arraignment Procedure (1975 Approved Draft). In § 150.3 (1) and (2), the Code takes the position that "[a] motion to suppress a statement . . . [obtained in violation of the Code's procedural protections which include right of access to counsel] shall be granted . . . if the court finds that the violation upon which it is based was substantial . . .. A violation shall . . . be deemed substantial if . . . [t]he violation was gross, wilful and prejudicial to the accused. . . ." According to § 150.3 (3), a violation, not meeting the foregoing test, may nevertheless be found substantial if it satisfies another definition of which material elements are "the extent of deviation from lawful conduct," and "the extent to which the violation was wilful."

courage the most objectionable kind of "risktaking" by the police. Mr. Justice Jackson said that any qualified lawyer will tell a suspect not to give a statement to the police.[15] Hence, faced with an attempt by a suspect to see a lawyer, as in *Hass*, or of a lawyer to see his client, as here, the police will have a choice: if they accede and allow a meeting with counsel, they will be obeying the Constitution, but they will get no statement from the suspect; if they deliberately prevent the contact, they will be scorning the Constitution, but they will have the chance of getting a statement from the suspect that can be used to impeach (and may have other practical uses). In sum, the police will have nothing to lose, and much to gain, by intentionally flouting the Constitution.[16] A rule of law presenting such a temptation to the police is radical and unwise.

It is said that permitting impeaching use of the statement furthers the truth-seeking function because only defendants bent on perjury will refrain from taking the stand through fear of being impeached. But the rule would in practice operate also against suspects who are trying to tell the truth throughout. Even one attempting to be as truthful as possible may recall certain facts incorrectly or fail to recall other important ones: the time after arrest is confused and pressure-filled; there is indeed

---

[15] *Watts* v. *Indiana*, 338 U. S. 49, 59 (1949) (Jackson, J., concurring in part and dissenting in part).

[16] The egregiousness of *Hass*, if it is taken to extend to permitting the use for impeachment of statements gained by deliberate denial of the right to counsel, is shown by comparing it with a rule that would apply *Harris* v. *New York* to allow impeaching use of statements gained by deliberate denial of proper *Miranda* warnings. If the latter rule were in force, the police would still have significant incentive to give the warnings, since many suspects give statements, which are fully admissible, after being given warnings. But in the situation of deliberate denial of the right to counsel there is no deterrance whatever of the illegal police conduct, since, as noted, an attorney if given access to his client will advise him to make no statement.

a subtle coercion that is inherent in all police interrogation. That a defendant at trial tells a story not on all fours with his prior statement to the police does not mean that he is committing perjury, but the inconsistency evident to the trier may nevertheless be devastating to the defendant's case. The possibility of initial error by even a conscientiously truthful suspect and the later embarrassment at trial are reasons why counsel will advise his client to remain silent and not to accommodate the police. All this very much qualifies the notion that allowing the impeaching use will further the search for truth.[17]

This court is, of course, at liberty to adopt a higher standard than that which the Supreme Court has applied to the States under the Federal Constitution. See *Cooper* v. *California,* 386 U. S. 58, 62 (1967). If, indeed, the *Hass* case goes so far as to hold that a statement obtained from a suspect by deliberate and calculated police obstruction of his right to counsel may be admitted for impeachment purposes at a State court trial, then we should decline to adopt such a rule and we should hold, instead, as a matter of Massachusetts law, that the statement is inadmissible for any purpose. It is instructive that at least two States have already rejected the milder doctrine of *Harris* v. *New York* and have imposed upon themselves a rule more protective of the accused. See *State* v. *Santiago,* 53 Hawaii 254 (1971); *Commonwealth* v. *Triplett,* 462 Pa. 244 (1975). See also, e.g., *State* v. *Brown,* 262 Ore. 442 (1972) (interpreting State Constitution's double jeopardy clause independently of Federal Constitution); *People* v. *Brisendine,* 13 Cal. 3d 528 (1975); *State* v. *Kaluna,* 55 Hawaii 361 (1974) (both

---

[17] Compare *United States* v. *Hale,* 422 U. S. 171 (1975), forbidding the prosecutor from asking a defendant why he did not tell the police at the time of his arrest the facts amounting to alibi that he testified to at trial. The *Hale* court reasoned that the inference the jury could draw — that the alibi was a contrivance — was so prejudicial to an honest defendant that questioning on the point must be forgone even though it might expose a perjurer.

interpreting State constitutional protection against un-
reasonable search and seizure to be broader than the
guaranty found in the Federal Constitution by the de-
cisions of *United States* v. *Robinson,* 414 U. S. 218
[1973], and *Gustafson* v. *Florida,* 414 U. S. 260 [1973]).

To conclude: The lawlessness of the "concerned group"
is here matched by official lawlessness. Both brands of
anarchic behavior deserve solemn rebuke. Out of the
welter came a trial so beset by error that the conviction
should be reversed and judgment entered for the defend-
ant.

HENNESSEY, J. (dissenting). I dissent. I cannot concur
with the majority of the court in its conclusion that the
defendant's admissions made in and near the Sears parking
lot subsequent to 4:15 P.M. on December 9, 1971, were
properly received in evidence. Although it is clear from
the record that the trial judge conducted the proceedings
with extraordinary competence and thoroughness, and
with full appreciation of the constitutional issues, I do
not believe that his ruling which permitted the intro-
duction of the evidence was constitutionally permissible.
Due process of law required the exclusion of the evidence.[1]
Neither can I concur entirely in the reasoning of Justice
Kaplan, as to this issue, in his dissenting opinion.

As to the second principal issue, whether the defend-
ant's statements to the police at the hospital were admis-

---

[1]Both the majority opinion and the dissenting opinion of Justice
Kaplan express special concern for the threat to individual rights
inherent in vigilantism. This is not to say that the defendant's rights
are any greater because he was a victim of private persons rather
than police officers (compare the statement by Kaplan, J., *supra,* that
"constitutional protections should have been accorded to the accused
with particular scruple"). Nevertheless, it is a fair inference that the
threat of vigilantism to constitutional rights is particularly acute at
this time of greatly increased violent crime and resulting widespread
fear and frustration. It is worth noting that several of the most
popularly received recent books and moving pictures dealt with (and,
it can be contended, glorified) violent self-help of the kind shown in
the instant case.

sible in evidence, I disagree with the majority and I concur with the conclusion and reasoning of Justice Kaplan in his dissenting opinion, viz.: that this evidence was not admissible even for the limited purpose of impeachment of the defendant.

1. In light of some of the differences between the majority view and the dissent of Justice Kaplan, particularly as expressed in part II, section 4, of the majority opinion, I feel compelled to explore the standards of appellate review which should be applied by this court on issues such as are presented here. It is necessary to decide what standards are appropriate, not only in the hope of reaching the correct result in this case, but also for the sake of evenhanded justice in similar appeals. This court must have regard for two obligations in particular: its responsibility as an appellate court to reverse for errors of law, and its responsibility to defer where appropriate to findings of fact as made by the triers of fact at the trial level.

A defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, on an involuntary confession. *Rogers* v. *Richmond*, 365 U. S. 534, 540-541 (1961). The defendant here presses the constitutional issue by motions to suppress his admissions from evidence. These motions, and the inherent voluntariness issue, like all questions as to the admissibility of evidence, were for the judge's (not the jury's) determination. *Lego* v. *Twomey*, 404 U. S. 477, 489-490 (1972).[2]

In order to meet the constitutionally required standards of admissibility the burden is on the Commonwealth to

[2] The evidentiary and constitutional question of voluntariness is not to be confused with the issue of reliability (truth or falsity) of the confession, which is for the jury's decision. See *Jackson* v. *Denno*, 378 U. S. 368, 385-386 (1964); *Lego* v. *Twomey*, 404 U. S. 477, 484-485 n. 12 (1972). Also, we note that the Massachusetts rule that the voluntariness issue is to be submitted to the jury, if the judge first finds voluntariness after a hearing, is not of constitutional dimensions. See *Commonwealth* v. *Valcourt*, 333 Mass. 706, 710 (1956); *La-*

prove, at least by a preponderance of the evidence, that a confession was voluntary. *Lego* v. *Twomey*, 404 U. S. 477, 489 (1972).[3]   The question whether a confession was voluntarily given and rightly admitted presents a two-step analysis for an appellate court.   First, the appellate court must determine whether the trial court's subsidiary findings of fact are supportable in evidence, and are warranted.   Second, and of crucial importance, assuming the findings are warranted, the appellate court must *independently* determine whether admission of a confession is constitutionally permissible *on the facts as found and accepted.*

Where the facts are disputed, the resolution of such conflicts is for the judge and the appellate court must accept his findings.   It is not for the reviewers to reconsider decisions of fact, since those decisions concern appraisals of the credibility of witnesses.   This author, in a concurring opinion in *Commonwealth* v. *Murphy*, 362 Mass. 542, 550 (1972),[4] phrased it this way: "We cannot properly be asked to revise a judge's subsidiary findings of fact, where they are warranted by the evidence, or to review the weight of the evidence related to the findings."   Like the United States Supreme Court, this court "does not sit as in *nisi prius* to appraise contradictory factual questions." *Ker* v. *California*, 374 U. S. 23, 34 (1963).

However, the appellate court is bound to review the ultimate conclusions of a judge where those conclusions

---

*France* v. *Bohlinger*, 499 F. 2d 29, 35-36 (1st Cir. 1974), cert. den. sub nom. *LaFrance* v. *Meachum*, 419 U. S. 1080 (1974).

[3] Similarly, the burden of proof is on the government to establish the reasonableness of a warrantless search (*Chimel* v. *California*, 395 U. S. 752, 756 [1969]), and to prove reasonableness at least by a preponderance of the evidence. *United States* v. *Matlock*, 415 U. S. 164, 177-178, n. 14 (1974).

[4] Both the majority opinion and Justice Kaplan's dissenting opinion in this case refer to this concurring opinion in the *Murphy* case. See in particular n. 2 of Justice Kaplan's dissent.

are of constitutional moment. This author expressed it this way in the concurring opinion in the *Murphy* case, *supra:* "[T]he *ultimate* findings and rulings of a judge may give rise to a meaningful appeal, even in a case where his subsidiary findings are beyond practical challenge. This is true because the ultimate conclusions of a judge on identification issues may be of constitutional proportions. This court must, where justice requires, substitute its judgment for that of a trial judge at the final stage. . . . The mere recital of appropriate phrases denoting constitutional acceptability may serve only to obscure error in admitting the evidence." 362 Mass. at 551 (1972).

Mr. Justice Harlan, quoting from *Watts* v. *Indiana*, 338 U. S. 49, 51-52 (1949), expressed the principle as follows: "[T]here has been complete agreement that any conflict in testimony as to what actually led to a contested confession [or to a contested arrest] is not this Court's concern. Such conflict comes here authoritatively resolved by . . . [the trial judge]" (citations omitted). *Beck* v. *Ohio*, 379 U. S. 89, 100 (1964) (Harlan, J., dissenting).

2. Examining the ultimate issue of voluntariness here, I conclude that the admissions[5] of the defendant, including his statements made subsequent to 4:15 P.M., should have been excluded. I accept, as I must and should, the judge's subsidiary findings of fact in their entirety, since these findings were adequately supported in the evidence. However, on the basis of the findings, in my view it cannot constitutionally be concluded that the Commonwealth has sustained its burden of proving voluntariness.

The judge found that the defendant was assaulted, kidnapped, threatened, and interrogated for hours. He

---

[5] I note that neither the majority opinion nor the dissenting opinion makes any point of distinguishing "admissions" from "confessions" in the constitutional context concerned here. In this I concur; it would be specious to indulge in variant reasoning or results based on such a distinction.

was in captivity for at least twenty hours between the
early evening of December 8, 1971, and the late after-
noon of December 9, 1971. He was isolated from family,
friends and counsel. Although there was opportunity for
him to escape during approximately the last two hours of
this time, in my view an inference of voluntariness is not
warranted even as to his admissions during those final
few hours. I believe this conclusion inescapably follows
from an application of the "stream of events" and "cat-
out-of-the-bag" reasoning as carefully explored by Justice
Kaplan in his separate dissenting opinion.

It follows that I cannot accept the contention of the
majority that this court is bound by the judge's ultimate
conclusion of voluntariness, or any inference of his that is
synonymous with voluntariness or so broad as necessarily
to import a conclusion of voluntariness (e.g., the finding
that the defendant was "completely free from fear" after
his encounter with the hunters).

Considering all the circumstances of the more than
twenty hours of captivity, and accepting all the judge's
subsidiary findings, I do not believe the case permits a
conclusion that the Commonwealth has proved by a fair
preponderance of the evidence that the defendant's state-
ments at any time on December 9 were free of the in-
fluence of duress, fear and hopelessness caused by his
captors.

The ultimate conclusion as to voluntariness requires the
application of constitutional principles to facts. It is a
conclusion which partakes of policy considerations and as
such "is not a matter of mathematical determination.
Essentially it invites psychological judgment — a psycho-
logical judgment that reflects deep, even if inarticulate,
feelings of our society." *Haley* v. *Ohio*, 332 U. S. 596,
603 (1948) (Frankfurter, J., concurring).

As was stated in *Lyons* v. *Oklahoma*, 322 U. S. 596,
602 (1944), a case involving the voluntariness of a second
confession given twelve hours after a first coerced confes-
sion, "The question of whether those confessions subse-

quently given are themselves voluntary depends on the inferences as to the continuing effect of the coercive practices which may fairly be drawn from the surrounding circumstances. . . . When conceded facts exist which are irreconcilable with such mental freedom, regardless of the contrary conclusions of the triers of fact, whether judge or jury, this Court cannot avoid responsibility for such injustice by leaving the burden of adjudication solely in other hands."

However, although I concur with Justice Kaplan that the admissions of the defendant should have been excluded, I cannot concur in his entire reasoning. It is neither necessary nor desirable for this court to reach affirmative findings of fact, substantially contrary to the findings of the trial judge.[6] Nor is it significant that some of these findings were so broad as to approach the ultimate constitutional conclusion; they were affirmative, substantially contrary to the judge's findings, and unnecessary. Such a process (of making findings at the appellate level) is markedly different from concluding, as I have, in light of where the burden of proof lay, that certain inferences drawn by the trial judge were not warranted on the facts as found by him. Also, such a

---

[6] See, e.g., in Justice Kaplan's dissenting opinion, *supra,* the following findings: "On these facts, I conclude that the defendant's acceptance of the condition that he reveal the gravesite was as much coerced as his initial statements"; "His statements at the Sears parking lot were thus made within a continuing constraint and compulsion"; "[T]he defendant remained under the heel of the kidnappers through the 6:30 P.M. statements"; "So the conclusion is well justified that the coercion which produced the pre-4:15 P.M. statements was also the cause of the post-4:15 statements"; "And here, to repeat, we have the added, overriding factor that the defendant was under great continuing pressure to make the final disclosure of the gravesite as a means of getting free of the kidnappers"; "[H]is further remarks to Heard were nothing but self-comforting braggadocio"; "Rather, the most modest conclusion that emerges from the facts is that the post-4:15 P.M. statements were substantially conditioned and influenced by the coercion directed at the defendant throughout the period during which he was held."

process is significantly different from concluding, as I have, that the Commonwealth has failed to sustain its burden of proof on the issue of voluntariness. Our hope for evenhanded disposition of such difficult matters, free of appellate whim, requires that we not encroach on the trial judge's function.[7]

3. I concur in Justice Kaplan's dissenting reasoning that the statements of the defendant to the police at the hospital should have been excluded, even for impeachment purposes. I do not believe that *Harris* v. *New York*, 401 U. S. 222 (1971), stands for the proposition that wilful violations by the police of the defendant's right to counsel, such as occurred in the instant case, permit the use of the resulting product of the interrogation for any purpose. See in particular 401 U. S. at 226-232 (Brennan, J., dissenting). Nor do I believe that *Oregon* v. *Hass*, 420 U. S. 714 (1975), sufficiently modified the holdings of the *Harris* case to permit the result reached by the majority.

---

[7] Concededly other courts, including the Supreme Court of the United States, have approached some cases substantially as Justice Kaplan has treated this one.